**PRELOAD TECHNOLOGY, INC.,**
Plaintiff-Appellee,

v.

**A.B. & J. CONSTRUCTION COMPANY,**
INC., Defendant-Appellant.

No. 82–1050
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Jan. 27, 1983.

Rehearing and Rehearing En Banc
Denied March 14, 1983.

Joe F. Canterbury, Jr., Frederic Gover, Dallas, Tex., for defendant-appellant.

W. Edward Walts, Dallas, Tex., for plaintiff-appellee.

Before RUBIN, JOHNSON and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is a Texas law diversity suit between a general contractor, Preload Technology, Inc., and a subcontractor, A.B. & J. Construction Company, Inc. Preload Technology sued A.B. & J. under theories of breach of contract and promissory estoppel for damages resulting from A.B. & J.'s refusal to perform "earth work and piping" on a water project in Grand Prairie, Texas for which A.B. & J. had submitted a subcontractor's bid. The district court, following a bench trial, held for Preload Technology under both theories, and A.B. & J. appeals on the questions of liability, damages, and the award of attorney's fees. We affirm.

I.

FACTS

In March 1979, Preload Technology, a general contractor, was preparing to bid on the construction of a "ground storage reservoir" for the City of Grand Prairie, Texas and was accepting bids from subcontractors to do "earth work and piping" on this project. A.B. & J. learned of the project and became interested in submitting a subcontractor's bid. On March 26, 1979 A.B. Cadenhead, president of A.B. & J., met with Jack Hornstein, vice president of Preload Technology, to discuss the work required for this subcontract.[1] The deadline for the submission of bids to the City was the next day, March 27, at 11:00 a.m. At this meeting Cadenhead gave Hornstein an oral tentative estimate of the cost to perform the work, and Hornstein told him that this "quotation" was the lowest received by Preload Technology, "and to please look his price over to make sure all the work that we discussed was included." Early the following morning, Cadenhead called Hornstein with a revised and final bid which was

---

1. Preload Technology, with its sister corporation, the Preload Company, are subsidiaries of Preload Concrete Structures. They will be referred to collectively as the "Preload Group." Hornstein testified that, in addition to being vice president of Preload Technology, he was also president of Preload Company and vice president of the parent company, Preload Concrete Structures, "which owns Preload Company and Preload Technology".

$30,000 higher. Hornstein informed him that he was still the low bidder, "that we would like to use him and in order to use him I needed a written confirmation before the bid [of Preload Technology to the City] went in." Cadenhead thereupon agreed to submit this bid to Preload Technology in writing before the City's 11:00 a.m. deadline. He did so[2] and Preload Technology in fact incorporated it into its final bid submitted to the City of Grand Prairie.[3] When bids were opened March 27, 1979, Preload Technology was the low bidder and on April 4, 1979, it was formally awarded the contract by the City of Grand Prairie.

On April 4, 1979 Cadenhead telephoned Hornstein to inquire about the status of A.B. & J.'s bid. Hornstein was not in the office and Cadenhead's call was transferred to Bill Bush, the United States construction manager for Preload Technology and the vice president in charge of construction for the Preload Company, a sister corporation.

Bush informed Cadenhead that A.B. & J. would be the subcontractor used on the Grand Prairie water project since its bid had been the lowest, and this conversation was confirmed with a memo sent to Cadenhead the same day under the "*Preload Company*" letterhead. Preload Technology throughout these negotiations contemplated that the Preload Company, until this time unknown to Cadenhead, would sign the actual subcontract with A.B. & J.

Subsequently, on April 17, 1979, Cadenhead sent a letter to the *Preload Company,* informing it that A.B. & J. would not act as a subcontractor on the Grand Prairie project, citing "changes in our workload and other developments," and stating "it would be utterly impossible for us to perform the work in the allotted time without escalating our equipment inventory and increasing our personnel level beyond our desire."[4] Hornstein responded for Preload

---

2. When bids were submitted on March 27, 1979, the City of Grand Prairie was debating between the construction of a six and an eight million gallon tank (ultimately the latter was selected). Preload Technology requested bids from subcontractors for excavations of three different diameters for each of these tank sizes. A.B. & J. submitted the following bid, which was in its name and signed by Cadenhead as its president:

"March 27, 1979
RE: Ground Storage Reservoir
Grand Prairie, Texas
Preload Technology, Inc.
839 Stewart Avenue
Garden City, New York 11530
Gentlemen:
We propose to furnish all equipment, labor, materials, and incidentals necessary to complete the earthwork and piping on subject project, as outlined on plans prepared by Hunter Associates, Inc., Consulting Engineers, dated March 1979, and in accordance with the requirements of the City of Grand Prairie, for the sums listed below:
1. 8,000,000 gal. tank w/261' dia. excavation $518,437.00
2. 8,000,000 gal. tank w/235' dia. excavation $461,043.00
3. 8,000,000 gal. tank w/223' dia. excavation $449,944.00
4. 6,000,000 gal. tank w/232' dia. excavation $473,608.00
5. 6,000,000 gal. tank w/206' dia. excavation $442,861.00

6. 6,000,000 gal. tank w/194' dia. excavation $436,586.00
We do not include (1) foundation for or any part of the storage tank; (2) electrical; (3) controls, ventilator on roof or tank; (4) new fencing or replacement of existing fence; or, (5) general contract administration."
This written bid was hand delivered to Hornstein prior to Preload Technology's submittal of its bid to the City.

3. The trial court so found, and this finding is amply supported by Hornstein's testimony, and by his worksheet showing that A.B. & J.'s bid was used and that the exact amount of its quotation for the 223 foot diameter excavation formed the basis for the price bid by Preload Technology to the City. The trial court also found A.B. & J.'s written bid was "final," that Preload Technology "relied" on the A.B. & J. written bid in submitting its bid to the City, and that "this reliance" was "commercially reasonable."

4. The full text of Cadenhead's letter reads as follows:
"Re: 8.0 M.G. Reservoir
Grand Prairie, Texas
Preload Company
839 Stewart Avenue
Garden City, New York 11530
Gentlemen:
We are sorry to have to inform you that due to changes in our work load and other developments we will be unable to commit our services to you in connection with subject project.

Technology by an April 25, 1979 letter to Cadenhead demanding that he retract his refusal and threatening a lawsuit if he did not. The parties then had a meeting on May 10 at which they were unable to reach an agreement, and Cadenhead maintained his refusal to perform. Hornstein then solicited bids from other subcontractors, and in June 1979 United Contracting Company (United) was awarded the subcontract to perform the work for $605,000, which was $155,056 higher than the A.B. & J. bid.

Preload Technology then filed suit against A.B. & J., claiming its right to recover under theories of breach of contract and promissory estoppel. At trial Cadenhead asserted that his refusal to perform was due to the fact that the Preload Company sought to accept his bid when it had been submitted to Preload Technology, Inc., a different entity. Cadenhead claimed that he never intended to do business with the Preload Company and that he had doubts about its financial stability as well as the financial stability of Preload Technology. He maintained that he expressed these doubts by the phrase "other developments," used in his April 17, 1979 letter. The district court, however, determined, with ample justification, that Cadenhead's testimony was "not credible." It found that the corporate structure of the "Preload Group" was not material to A.B. & J., and that the reason A.B. & J. refused to perform was its fear of losing money on the subcontract.[5] The district court held A.B. & J. liable under theories of promissory estoppel and breach of contract, and awarded Preload

Technology damages equal to the difference between A.B. & J.'s bid and the bid of United, the subcontractor which actually performed the work, together with attorney's fees.

On appeal, A.B. & J. denies its liability under both theories, objects to the calculation of damages and objects to the award of attorney's fees if liability is based on a theory of promissory estoppel. We affirm A.B. & J.'s liability on the grounds of promissory estoppel and the award of damages and attorney's fees.[6]

## II.

### PROMISSORY ESTOPPEL

Texas cases have recognized the doctrine of promissory estoppel as set forth in § 90 of the Restatement (First) of Contracts. *Wheeler v. White*, 398 S.W.2d 93 (Tex. 1965); *Cooper Petroleum Co. v. LaGloria Oil & Gas Co.*, 436 S.W.2d 889 (Tex.1969). Section 90 states:

"A promise which the promisor should reasonably expect to induce action or forebearance of a definite and substantial character on the part of the promisee and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise." Restatement (First) of Contracts § 90.

In *Montgomery Industries International, Inc. v. Thomas Construction Co.*, 620 F.2d 91 (5th Cir.1980), this Court applied § 90 in a Texas law diversity suit involving a gen-

---

This decision is in the best interest of our respective firms since it would be utterly impossible for us to perform the work in the allotted time without escalating our equipment inventory and increasing our personnel level beyond our desire.

We thank you for your interest in our company and should we be able to assist you in some mutually advantageous and limited phase of your work, please call on us."

5. Hornstein testified that at the May 10, 1979 conference between the parties Cadenhead "intimated" that he had underbid the job by $100,-000, and refused to perform for that reason. This testimony, though not expressly contradicted was not corroborated by Bill Bush, of Preload, who was also at the meeting. Caden-

head denies having made the statement, but the district court in its findings credits Hornstein's testimony on this point. We also accept this finding, which is not clearly erroneous in light of this evidence and the record as a whole. We also note the credible evidence that neither at the May 10 meeting nor otherwise prior to the commencement of litigation did A.B. & J. ever take the position that its refusal was based on acceptance by Preload Company rather than Preload Technology.

6. Having based our affirmance on a theory of promissory estoppel, we decline to address the issue of whether a contract was ever formed between the parties.

eral contractor's reliance upon a subcontractor's bid which the latter thereafter revoked. In *Montgomery,* Thomas Construction Co. was a general contractor bidding on the construction of a hospital in Galveston, Texas. It solicited bids from suppliers of pneumatic trash disposal systems. Trans Vac Systems submitted the lowest bid, and Thomas incorporated Trans Vac's figure into its final bid offer on the hospital. Thomas learned that it had submitted the lowest bid on the overall job and immediately informed Trans Vac that the latter's bid on the trash disposal system had been lowest. Trans Vac subsequently refused to perform the work on the system for the price stated in its bid. Trans Vac offered to perform for an additional $32,500 and Thomas, without a realistic alternative, accepted. After construction Thomas refused to pay the added sum, and Trans Vac sued to recover it.

In its analysis the *Montgomery* court relied heavily on the case of *Drennan v. Star Paving Co.,* 51 Cal.2d 409, 333 P.2d 757, 760 (1958), in which Justice Traynor explained the rationale for applying the doctrine of promissory estoppel in such instances:

"When the plaintiff [general contractor] used the defendant's [subcontractor's] offer in computing his own bid, he bound himself to perform in reliance upon defendant's terms. Though defendant did not bargain for this use of its bid neither did defendant make it idly, indifferent to whether it would be used or not. On the contrary it is reasonable to suppose that defendant submitted its bid to obtain the subcontract. It was bound to realize the substantial possibility that its bid would be the lowest and that it would be included by plaintiff in his bid. It was to its own interest that the contractor be awarded the general contract; the lower the subcontract bid, the lower the general contractor's bid was likely to be and the greater the chance of acceptance and hence the greater defendant's chance of getting the paving subcontract. Defendant had reason not only to expect plaintiff to rely on its bid but to want him to. Clearly defendant had a stake in plain-

tiff's reliance on its bid. Given this interest and the fact that plaintiff is bound by his own bid, it is only fair that plaintiff should have at least an opportunity to accept defendant's bid after the general contract has been awarded to him." 333 P.2d at 760.

Based on this rationale, the court in *Montgomery* held Trans Vac liable to Thomas under a theory of promissory estoppel. It concluded:

"In Texas, a subcontractor who submits a bid offer to a general contractor, knowing that the general contractor is going to rely on its bid in submitting the general bid, is bound unless it is clearly shown that the subcontractor's bid offer was not final." 620 F.2d at 97.

■ We hold that the case at hand falls within this general rule. A.B. & J. was specifically advised to recheck its bid, because it was the lowest. It did so, and submitted a higher bid. It was again informed that its bid was lowest and that Preload Technology intended to use it. Written confirmation was requested, and furnished, *so that Preload Technology could rely* on the A.B. & J. bid in making its bid to the City. A.B. & J. intended its bid to be final and knew and intended that it would be relied on by Preload Technology. The A.B. & J. bid was in fact the lowest, and Preload Technology unquestionably did rely on it in making its bid to the City. Preload Technology was awarded the City contract, and A.B. & J. was promptly advised and tendered the work bid at its bid price.

■ Citing evidence that Preload Technology anticipated from the start that A.B. & J.'s subcontract would be formally executed by the Preload Company, and that in fact the "replacement" earth work and piping subcontract with United was executed by the Preload Company, A.B. & J. argues that Preload Technology never intended to be bound by the A.B. & J. bid offer and accordingly may not invoke promissory estoppel. We reject this contention.

The record reflects, and the trial court found, that Preload Concrete Structures,

Inc. is the parent corporation of Preload Technology and the Preload Company, both of which it "owns." These corporations all have overlapping officers and directors, have the same office and telephone and operate under a single consolidated balance sheet. The evidence showed "a loss to one results in a loss to all." They function essentially as a unit. Preload Company usually serves as the operating construction arm or division of the Preload Group. Bill Bush was the construction manager on the project for both Preload Technology and Preload Company, and would have overseen the work under the earth work and piping subcontract regardless of whether A.B. & J. had contracted with Preload Technology or Preload Company, and the scope of the work would have been the same in either case. The trial court found that Preload Technology entered into the subcontract with United "through Preload Company," in effect finding that Preload Company was acting as Preload Technology's agent for this purpose and that Preload Technology bore the cost of the United subcontract.[7]

There can be no doubt that Preload Technology intended to have A.B. & J. perform the earth work and piping covered by the A.B. & J. bid. This was the basis of Preload Technology's bid to, and subsequent contract with, the City. A.B. & J. was promptly informed that it would be awarded this work. Nor can there be any doubt that Preload Technology intended to become obligated to pay for this work. A five percent bid bond was required of and submitted by Preload Technology for its bid on the project, and Preload Technology subsequently executed the contract with the City, and became obligated to fulfill it. The bidding specifications, which A.B. & J. had prior to making its bid, not only called for a bid bond, but also required the general contractor to furnish performance and payment bonds in the amount of 100% of the contract price.[8] On April 4, when Preload Technology entered into the contract with the City, it furnished performance and payment bonds executed by itself as principal and Insurance Company of North America as surety, each in the amount of $1,652,000, the condition of the payment bond being the principal's payment of all those supplying labor or material (whether or not pursuant to contract with or directly to the principal) in the prosecution of the work called for by the contract.[9]

■ A.B. & J., of course, had the right to insist that its subcontract be with Preload

---

7. We also note that following testimony of Hornstein, who was plaintiff Preload Technology's representative at trial, given in the context of questions concerning Preload Technology's contract with the City, viz: "Q. Did your company pay United Contracting for the work it performed on the Grand Prairie water project? A. Yes, we did."

The finding that Preload Technology subcontracted with United "through Preload Company" has not been challenged on appeal.

While A.B. & J. pleaded that if any loss was suffered, it was suffered by Preload Company, not by Preload Technology, there is no evidence to support such a claim, nor was any attempt made to develop it at trial. Moreover, A.B. & J. has not raised any such contention on appeal (nor did it do so in its motion to dismiss at the close of plaintiff's evidence, in any recorded trial motion thereafter, or in its motion for new trial and to amend findings of fact). Considering the foregoing, and the record as a whole, we decline to disturb the judgment below on any theory that whatever loss occurred was suffered by Preload Company instead of Preload Technology.

8. Moreover, Texas law has at all times material required, in connection with all public works contracts over $25,000 by cities (or certain other governmental units), that the prime contractor furnish payment (and performance) bonds, in the amount of the contract price, with a corporate surety licensed to do business in the state. Such payment bonds are solely for the benefit of, and may be sued upon by, any persons or corporations which have "furnished labor or material in the prosecution of the work provided for in such contract," regardless of whether such persons have a direct contractual relation with the prime contractor. Tex.Rev. Civ.Stat.Ann. art. 5160 (Vernon's 1971 & Supp. 1982).

9. The surety's summary balance sheet attached to the bonds shows assets of 2.78 billion dollars, and combined capital and surplus of 445 million dollars. Each bond states that its coverage shall be as required by Article 5160 (*see* note 8 *supra* ). The contract with the City refers to the bonds and incorporates them by reference.

Technology, to which its bid was submitted. But A.B. & J. did not refuse to perform because the April 4 acceptance letter was from Preload Company rather than Preload Technology. The only reason for refusal which it gave in response to the April 4 acceptance letter was that "it would be utterly impossible for us to perform the work in the allotted time" (its real reason was that it would lose money). Moreover, the April 25 letter, demanding that A.B. & J. rescind the retraction of its bid, was from Preload Technology. Preload Technology was clearly capable of formally subcontracting with A.B. & J., and there is no suggestion that it would have been unwilling to do so had A.B. & J. ever raised this contention. By contrast, A.B. & J. would not have performed regardless of the identity of the party "contractor" in the subcontract. As Cadenhead testified, "I made up my mind I did not want to enter into a contract with Preload Technology, Preload Company or Preload anything."

Instead of refusing the acceptance of its bid on the grounds that the acceptance came from Preload Company, rather than Preload Technology, A.B. & J. clearly indicated that it would perform under no circumstances. Preload Technology was not then required to do the obviously useless act of tendering a more formally correct acceptance in its own name, even were we to assume that the April 25 letter was insufficient for this purpose.

The law generally recognizes that "[n]o one should be required to do a useless act, and if, because of a party's repudiation, it appears that the occurrence of a condition of a duty would not be followed by performance of the duty, the non-occurrence of the condition is generally excused." Restatement (Second) of Contracts, § 255, Comment a. Cf. Sharpstown State Bank v. Great American Ins. Co., 441 S.W.2d 548 at 568 (Tex.Civ.App.—Austin 1969), rev'd on other grounds, 460 S.W.2d 117 (Tex.1970), on remand, 469 S.W.2d 254 (Tex.Civ.App.—Austin 1971, n.r.e.) (Texas recognizes predecessor section to section 255); Modern Aero Sales, Inc. v. Winzen Research, Inc., 486 S.W.2d 135 at 140–141 (Tex.Civ.App.—Dal-las 1972, n.r.e.) (tender excused where tenderee indicates unwillingness to accept); Warrior Constructors v. Small Bus. Inv. Co., 536 S.W.2d 382 at 386 (Tex.Civ.App.—Houston [14th Dist.] 1976, n.w.h.) (same); Gheen v. Diamond Shamrock Corp., 529 S.W.2d 289 at 293 (Tex.Civ.App.—Waco 1975, n.r.e.) (refusal of tender for other reasons waives right to complain of medium of tender). Under the rule of Montgomery, the subcontractor in a case such as this is estopped from withdrawing its bid. Id., 620 F.2d at 96; Drennan, supra, 333 P.2d at 760. It is as if the subcontractor were contractually bound to keep its offer open. Cf. Restatement (Second) of Contracts, § 90, Comment d ("[a] promise binding under this section is a contract ...."). A.B. & J., by repudiating its obligation to keep its offer open, may be viewed as having excused Preload Technology from making a formal tender of a technically sufficient acceptance, just as an optionee's failure to formally exercise an option will be excused by the optionor's prior repudiation thereof. Restatement (Second) of Contracts, § 253, Illustration 3. Cf. Jones v. Gibbs, 133 Tex. 627, 130 S.W.2d 265 at 272, motion overruled, 133 Tex. 644, 131 S.W.2d 957 (1939) ("... failure of the optionee to comply strictly with the terms or conditions of the option will be excused where such failure is brought about by the conduct of the optionor."); Berne v. Keith, 361 S.W.2d 592 at 605 (Tex.Civ.App.—Houston 1962, n.r.e.) (Texas recognizes doctrine of anticipatory breach).

In circumstances analogous to those here, the courts in allowing the general contractor recovery under § 90 have refused to countenance the subcontractor's wrongful withdrawal of its bid by the afterthought assertion that the bid's acceptance was technically deficient. See Debron Corp. v. National Homes Construction Corp., 493 F.2d 352 at 358–359 (8th Cir.1974) (subcontractor on whose bid general relied and who refused tendered subcontract only on ground bid was unauthorized, may not thereafter defend refusal on ground that subcontract varied bid terms); Reynolds v. Texarkana Construction Co., 237 Ark. 583,

374 S.W.2d 818 at 820 (1964) (subcontractor on whose bid general relied and who "rejected the proposed subcontract upon the sole ground that he could not do the work for the price that was offered," may not thereafter defend this rejection on the basis of other assertedly objectionable terms in the tendered subcontract). *Cf. Cooper Petroleum Company v. LaGloria Oil & Gas Company, supra,* 436 S.W.2d at 894 (estoppel may be predicated on silence where there is a duty to speak); *Wheeler v. White, supra,* 398 S.W.2d at 96–97 (§ 90 may be invoked even if the promise to be enforced is too incomplete to constitute the basis of a contract).[10]

It was neither objectively nor subjectively material to A.B. & J. whether its subcontract was with Preload Technology or Preload Company, and A.B. & J. would have refused a contract with either; A.B. & J.'s communication of its repudiation to Preload Technology did not suggest any technical deficiency in the acceptance of its bid and plainly announced that *any* attempted acceptance would be futile; Preload Technology was bound, by its contract with the City and by its performance and payment bonds, to see to it that the work called for by the A.B. & J. bid was completed and paid for, and Preload Technology at all times plainly intended to have A.B. & J. as the earth work and piping subcontractor on the job and to see to it that A.B. & J. was paid; Preload Technology had the ability to formally contract with A.B. & J., and there is nothing to suggest that it would not have, had A.B. & J. ever raised the point; while the acceptance letter of April 4 was from Preload Company, the April 25 letter was from Preload Technology, and the two companies were substantially identical. Under these circumstances, we will not defeat Preload Technology's recovery under § 90, either on the theory that it originally contemplated having the A.B. & J. subcontract formally executed by Preload Company or on the theory that there was a technical deficiency in the acceptance of the A.B. & J. bid.

 To prevent potential inequities, the courts have properly placed certain limits on the application of the doctrine of promissory estoppel in subcontractor bid situations. This case, however, does not transgress such limits. One such limitation is that promissory estoppel will not operate to keep the subcontractor's bid open beyond a reasonable length of time (or such other period as may be specified in the bid). *Drennan, supra,* 333 P.2d at 760 (1958); *Wargo Builders, Inc. v. Douglas L. Cox Plumbing & Heating, Inc.,* 26 Ohio App.2d 1, 268 N.E.2d 597, 599 (1971). Here, however, the city contract was awarded to Preload Technology on April 4, and as a result of the April 4 conversation between Bush and Cadenhead, A.B. & J. knew that Preload Technology was expecting A.B. & J. to do the work in accordance with its bid. This conversation was confirmed by letter the same date. As noted, it was never material to A.B. & J. that the April 4 letter was from Preload Company, instead of Preload Technology. Further, A.B. & J.'s attempted withdrawal was not on the grounds of untimeliness in accepting. Indeed, it is evident that as between the parties at the time there was no question of

10. While *Wheeler* indicates that where the promise is too incomplete to be enforced as a contract, only reliance damages, rather than lost profits, will be allowed, that limitation is irrelevant to the issues on this appeal. Preload Technology's damages consisted entirely of the additional expense occasioned by the excess of the United price over the A.B. & J. price; none of this difference included any element of profit for Preload Technology, which was already bound on its fixed price contract with the City. At no time has A.B. & J. taken the position that Preload Technology's recovery should be reduced by an allocable portion of the profit Preload Technology would have made if A.B. & J. had performed according to its bid, and there is no evidence to show what profit Preload Technology made or would have made or what portion thereof would be attributable to this portion of the work. Moreover, the nature of the asserted deficiency here under consideration—lack of a technically correct acceptance—has less relevance to the proper measure of damages (lost profits or reliance) than does the incompleteness of the terms of the promise with which the *Wheeler* decision was concerned.

the acceptance being unduly delayed. Under these circumstances, the district court did not err in failing to deny Preload Technology relief on grounds of undue delay.

■ Another limitation on the doctrine of promissory estoppel in cases of this kind is the prohibition against "bid shopping," "bid chiseling" and related practices sometimes engaged in by general contractors after they have been awarded the general contract and before they subcontract the particular part of the work in dispute. *See Drennan, supra,* 333 P.2d at 760. "Bid shopping" commonly refers to a general contractor's seeking of bids from subcontractors other than the one whose bid amount the general used in calculating its own bid, and often involves the general's informing the other subcontractors of the amount of the low bid and inviting them to undercut it. "Bid chiseling" usually refers to the general contractor's attempt to negotiate a lower price than that bid from the subcontractor whose bid figure the general employed in calculating its own bid, frequently by threatening to subcontract the work to a third party. *See generally,* Comment, *Construction Bidding Problem,* 19 St. Louis U.L.J. 552, 563–566 (1975). When these practices are engaged in, recovery by the general contractor under § 90 may be denied on a variety of theories, viz: that the general contractor did not in fact rely on the subcontractor's bid, or failed to accept it within a reasonable time, or rejected it by a counter-offer, or, perhaps more persuasively, because in such circumstances there is a failure to meet § 90's requirement that "injustice can be avoided only by enforcement of the promise." However this may be, there is no suggestion here of any "bid chiseling," "bid shopping" or similar practice on the part of Preload Technology with respect either to the earth work and piping subcontract or any other portion of the Grand Prairie water project. Preload Technology simply sought to have A.B. & J. perform the work it had bid on for the price stated in its bid, and never sought to vary either; nor, until A.B. & J. had clearly repudiated, did Preload Technology at any time seek other bids for the earth work and piping.

■ A.B. & J. also contends that promissory estoppel is inapplicable because its bid was not final. The *Montgomery* opinion reflects that recovery in such cases is not allowed if "it is clearly shown that the subcontractor's bid offer was not final." *Id.* at 97. Where the bid is expressly made revocable or subject to revision, or the like, it is obviously not final and there can neither be an implied promise not to withdraw or revise the bid nor reasonable reliance on it by the general contractor. A.B. & J.'s bid, however, contains no such, nor any other, express disclaimer of finality. Nonetheless, lack of the requisite finality in a bid may appear by implication, as well as expressly. A.B. & J. argues that too many "important areas were left unsettled" in the bid for it to be considered final. The record reflects, however, that Hornstein and Cadenhead went over the plans and the city's written specifications before the bid was submitted, and these are referenced in the bid. We cannot say that as a matter of law the bid was too incomplete or indefinite to be considered final.[11] Nor does the fact that the parties apparently contemplated execution of a formal subcontract following

---

11. *See, e.g., Johnson v. Snell,* 504 S.W.2d 397 at 399 (Tex.1974) (". . . failure of the contract to provide the fundamental provisions of a deed of trust does not render the contract to sell property in itself incomplete and unenforceable."); *Bendalin v. Delgado,* 406 S.W.2d 897 (Tex.1966) (price); *Estate of Griffin v. Sumner,* 604 S.W.2d 221 at 229 (Tex.Civ.App.—San Antonio 1980, n.r.e.) ("The provisions of the contract which may at first appear incomplete or uncertain are often readily made clear and plain by the aid of common usage and reasonable implication of the facts."); *Ball v. Cooper-* *Stanley Company,* 413 S.W.2d 467 at 468–469 (Tex.Civ.App.—Dallas 1967, n.w.h.); *Lilac Variety, Inc. v. Dallas Texas Company,* 383 S.W.2d 193 at 196 (Tex.Civ.App.—Dallas 1964, n.r.e.); *Kirkwood & Morgan, Inc. v. Roach,* 360 S.W.2d 173 at 175, 176 (Tex.Civ.App.—San Antonio 1962, n.r.e.) (parties to agree after work started on size of "turn around" to be built as part of road construction contract: "[a]ll parties were experienced with this type of work and knew what was expected of each party to the contract.").

acceptance of the bid necessarily render the bid not final. *See, e.g., Scott v. Ingle Bros. Pacific, Inc.,* 489 S.W.2d 554 at 555–556 (Tex.1972); *Mechanical Wholesale, Inc. v. Universal-Rundle Corp.,* 432 F.2d 228 at 230 (5th Cir.1970). As the cited cases indicate, this is frequently a question of fact. The circumstance that Preload Technology relied on A.B. & J.'s bid, and that both parties intended such reliance, is a further strong indication of the bid's finality. *See, Scott, supra,* 489 S.W.2d at 556.[12] *Cf. Montgomery, supra,* 620 F.2d at 96 (in rejecting a similar contention, we observed that it "would defeat the entire purpose of such bids as they are used in the commercial world."). We hold that the trial court's finding that the A.B. & J. bid was final is not clearly erroneous.[13]

**12.** In *Scott* the Texas Supreme Court quoted with approval from 1 Corbin on Contracts (1963) § 29, in part as follows:

"The court will be more ready to find that the apparently incomplete agreement was in fact complete . . . in case the parties have already . . . taken . . . material action in reliance. . . . The fact that they have so acted is itself a circumstance bearing upon the question of completeness of their agreement." 498 S.W.2d at 556.

**13.** A.B. & J. also contends that the Texas Statute of Frauds, Tex.Bus. & Com.Code Ann. § 26.01(b)(6) (Vernon 1967 & Supp.1982), applies because the general contract specifications required a one year warranty from date of completion, and Preload Technology intended to impose a similar requirement on the subcontractors. A.B. & J. then asserts there can be recovery under § 90 only if the "promise" to be enforced was to execute a written agreement complying with the Statute of Frauds. *See "Moore" Burger, Inc. v. Phillips Petroleum Company,* 492 S.W.2d 934 at 940 (Tex.1973); *Nagle v. Nagle,* 633 S.W.2d 796 at 800 (Tex. 1982). Assuming, without deciding, that the Statute of Frauds is applicable, we hold that A.B. & J. is not thereby exonerated. To begin with, if, as we have held, the bid could properly be regarded as final and as including an implied promise not to withdraw it pending a reasonable opportunity for acceptance following awarding of the general contract, then there can also be implied a promise to execute a written subcontract in accordance with the bid following its acceptance. Indeed, A.B. & J. does not seriously dispute this, and suggests that such a promise was implied in *Montgomery.* There is no less reason to do so here. There is ample evidence that a written subcon-

In a final effort to defeat recovery under § 90, A.B. & J. contends that this is an inappropriate case for promissory estoppel because the plaintiff, Preload Technology, failed to disclose its corporate structure, and hence came into court with "unclean hands." The evidence does not show that Preload Technology's failure in this respect was intentionally deceptive, and, as has been noted, it was in any event not material to A.B. & J. Thus we reject A.B. & J.'s "unclean hands" argument. *See Gillen v. Diadrill, Inc.,* 624 S.W.2d 259 at 263 (Tex. App.—Corpus Christi 1981, w.o.j.) ("clean hands maxim should not be applied" at behest of one who "has not been seriously harmed" by complained of conduct); *Arevalo v. Velvet Door, Inc.,* 508 S.W.2d 184 at 186 (Tex.Civ.App.—El Paso 1974, n.r.e.)

tract was contemplated on acceptance of the bid. As noted in the text, this does not necessarily render the bid other than final. However, we need not, and do not, decide in this case whether such an implied promise would meet the requirements of the Texas Statute of Frauds here. The Texas Statute of Frauds requires neither that the writing embody the entire contract nor that it be signed by both parties, but only that "a memorandum of" the promise or agreement be in writing and signed "by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him." Section 26.01(a). The "memorandum" need not embody all terms agreed upon. *See Botello v. Misener-Collins Company,* 469 S.W.2d 793 (Tex.1971) (in a case within the statute of frauds, an oral agreement as to the price and terms of payment may be proved even if the memorandum says nothing of these matters); *Hage v. Westgate Square Commercial,* 598 S.W.2d 709 at 712 (Tex.Civ. App.—Waco 1980, n.r.e.). The A.B. & J. bid was in writing and was signed by Cadenhead, whose authority to do so is not disputed. The bid signed by A.B. & J. was sufficiently complete so that allowance of recovery to Preload Technology against A.B. & J. under § 90 for the latter's wrongful total repudiation of the bid does not contravene the policy of the Texas Statute of Frauds. *Page & Wirtz Const. Co. v. Van Doran Bri-Tico Co.,* 432 S.W.2d 731 (Tex. Civ.App.—Amarillo 1968, n.r.e.), relied on by A.B. & J., is not to the contrary. *Page & Wirtz* was not an action under § 90, and neither the bid there, which specifically called for one year from completion warranty, nor any written memorandum whatsoever, was signed by the party sought to be charged.

(party relying on "the clean hands doctrine ... must show that he himself has been injured by the conduct complained of.").

■ Accordingly, we hold that Preload Technology was properly awarded recovery under the doctrine of promissory estoppel.[14]

## III.

## DAMAGES

A.B. & J. challenges the district court's computation of damages, arguing that the scope of the work performed by United was not the same as that bid by A.B. & J.

After A.B. & J.'s repudiation, Preload Technology solicited bids for the earth work and piping from several concerns. United eventually bid $605,000, and then entered into a subcontract for that amount. Due to various "extras" resulting from changes in the City's requirements, United was ultimately paid approximately $630,000, but the district court's $155,056 damage award was based only on the difference between the United bid and original subcontract price of $605,000 and the A.B. & J. bid of $449,944.

The testimony of Hornstein and Cadenhead establishes that the Hunter Associates engineering drawings and plans, and the printed book of specifications, upon the basis of which the general contract was bid and awarded, were reviewed by Hornstein and Cadenhead together in connection with A.B. & J.'s formulation of its bid. Hornstein testified that the plans were spread out before them and they "went over the work items item by item and in the specifi-

cations, which is the detail, written detail of what the drawings call for" and "reviewed the specific items of work that we were going to subcontract, the pipelines, the excavation, the backfilling, the grading." The very same plans and specifications formed the basis for the United bid.[15] Hornstein testified that the scope of the United work under its $605,000 bid and contract, exclusive of the "extras," was precisely the same as that covered in his conversation with Cadenhead and outlined in the A.B. & J. bid. Cadenhead, however, disputed this in certain particulars.

■ The district court, "resolving conflicts in the evidence and judging credibility of the witnesses" specifically found that the "United ... bid was based upon the identical plans which A.B. & J. reviewed ... and upon which A.B. & J.'s bid was based," that "the work done by United ... was the same work A.B. & J. was to have done" (other than "negotiated extras" for which recovery was not sought), that "A.B. & J. was obligated to do the same subcontract work for $449,944 which United ... performed for $605,000," and that A.B. & J.'s claim of "material differences" in the work "is not credible." Considering the above referenced evidence, we hold that these fact findings are not clearly erroneous and must be sustained. Though such evidence and findings are a sufficient answer to each of A.B. & J.'s various claims as to differences in the work, we will further briefly advert to these on a more particular basis.

The major A.B. & J. claim is that United's work involved a 260 foot *average* diameter excavation, and hence the damages

---

14. We note in passing that this case is not one in which the subcontractor has attempted to withdraw his bid before the awarding of the general contract, which might be a material circumstance if the general contractor were then able to withdraw or modify its bid (or possibly as to the general contractor's reliance damages). Nor are we here dealing with a situation in which the subcontractor's retraction results from the bid being based on a mistake on his part which should have been obvious to the general contractor, so that he could not *reasonably* rely on the subcontractor's bid. *See Wargo Builders, Inc. v. Douglas L. Cox Plumbing & Heating, Inc., supra,* 268

N.E.2d at 599 (Ohio App.1971). Here, as noted, A.B. & J. was specifically informed it was the low bidder and was asked to refigure, which it did, raising its bid by $30,000.

15. Although Preload Technology's working drawings and "details" were also furnished United, some of which A.B. & J. claims show items it did not intend to cover by its bid, the United representative testified that these were not utilized in preparing its bid or fixing its $605,000 price and did not affect the scope of the work it bid on utilizing the Hunter Associates drawings and the specifications.

should have been calculated by comparing United's $605,000 price to A.B. & J.'s bid for a 261 foot diameter excavation ($518,437) rather than to A.B. & J.'s bid for a 223 foot diameter excavation ($449,944). Resolution of this dispute depends on whether the relevant diameter measurement is the average diameter or the diameter at the base of the excavation. The trial court necessarily found the latter, and we hold such finding is not clearly erroneous.

The excavation, of course, was wider at its top than at its base. The City specifications, which were the basis for both the United and the A.B. & J. bids as well as for the general contract, provided that the work would have to conform to Occupational Safety and Health Administration regulations. Cadenhead, in making the A.B. & J. bid, was aware of this and was further aware that these regulations required that the excavation walls have a one-to-one, or 45 degree, slope. The hole actually dug by United was 34 feet deep, 226 feet in diameter at the base and 294 feet at the top, 68 feet wider there because of the slope. Cadenhead said its average diameter was 260 feet, which was comparable to his bid for a 261 foot diameter excavation.

As Cadenhead knew, the eight million gallon tank (the bid alternative selected by the City) had a diameter of 213 feet, and the base of the excavation required at least three additional feet for working space on each side, so A.B. & J. recognized at all times that the eight million gallon tank required a base diameter of not less than 219 feet.

Since the excavation was 34 feet deep and had a required 45 degree slope, a minimum 219 foot base diameter necessarily means a minimum *average* diameter of 253 feet for the eight million gallon tank. An *average* diameter of 223 feet would imply a base diameter of 189 feet, or 24 feet smaller than the tank itself; and, an *average* diameter of 235 feet would imply a base diameter of 201 feet, or 12 feet smaller than the tank itself. For the eight million gallon tank, A.B. & J. bid three diameter sizes, 223 feet, 235 feet and 261 feet, but did not specify whether the figures referred to average or base diameters (see note 2, *supra*). The district court accordingly could rationally reject Cadenhead's testimony that these bids referred to *average* diameters, and could properly find in accordance with Hornstein's testimony that Preload Technology's bid to the City was based upon the A.B. & J. bid specifying the 223 foot diameter excavation for the eight million gallon tank, and that the *same* excavation work was subcontracted to United.[16]

A.B. & J. also asserts that United performed other work, specifically perimeter foundation excavation, the grading of a 30 foot roadway around the top of the excavation, and the sterilization of certain pipes, which were not included in A.B. & J.'s bid. With respect to the first point, the "perimeter foundation excavation" appears merely to be the excavation required to prepare for the placement of the tank, which is exactly what was contemplated by A.B. & J.'s bid.[17]

---

**16.** At no time—either here or below—has A.B. & J. asserted that there is any material difference in the size of the excavation called for by its 223 foot diameter bid and that bid by United, *if* the 223 foot A.B. & J. bid is understood as referring to the *base* diameter. A.B. & J.'s sole contention in this regard is that the diameters it specified were *averages*. No contention is made that because United actually made its excavation base 226 feet in diameter, that this establishes a material difference between United's bid and the A.B. & J. 223 foot diameter bid *if* the latter is properly understood as referring to the base diameter.

**17.** In this argument A.B. & J. may have been referring to a working drawing (see note 15, *supra*), which depicted a ditch 11 inches deep

and about 10 feet wide around the perimeter of the floor of the excavation. The following exchange between A.B. & J.'s counsel and Charles Compton, a representative of United, on which A.B. & J. explicitly relies to support its argument, however, does not suggest that the "perimeter foundation excavation" was not included in the A.B. & J. bid:

"Q: (Counsel) Mr. Compton, for the price stated in your subcontract, did you do the foundation excavation in connection with the tank?
A: (Compton) Yes Sir. The perimeter foundation for the tank."

We note that the A.B. & J. bid excluded "foundation for or any part of storage tank"

Second, A.B. & J. complains that United was required to grade a 30 foot strip at the top of the excavation that was not included in its bid. Hornstein testified that such a strip was customary in excavation of this type and that he had discussed it with Cadenhead the night before the bid was submitted. The district court discredited Cadenhead's assertion to the contrary, and thus, this attack on the amount of damages also fails.

■ Finally, A.B. & J. argues that Preload Technology's contract with United called for the sterilization of all pipes and lines connected to the tank while the A.B. & J. bid was intended to include the sterilization of only one supply line. As above, the district court discredited Cadenhead's testimony to this effect and found, based on the testimony of Hornstein and Bush, that the scope of the work was the same for both subcontractors. It is clear that they each based their bids on the same set of plans and specifications. Thus, we affirm the district court's determination that the scope of work bid by A.B. & J. was materially the same as that covered by the United bid and contract, and hold that the district court's calculation of damages was proper.

IV.

ATTORNEY'S FEES

■ Texas law expressly provides for recovery of attorney's fees in "suits founded on oral or written contracts." Tex.Rev. Civ.Stat.Ann. art. 2226 (Vernon Supp. 1982–83).[18] A.B. & J. cites authority that this statute is penal in nature and should be strictly construed. *New Amsterdam Casualty Co. v. Texas Industries, Inc.,* 414 S.W.2d 914 (Tex.1967). It argues that since a suit founded on promissory estoppel does not fall expressly within the scope of this provision, Preload Technology is not entitled to attorney's fees. Preload Technology argues that promissory estoppel is contractual in nature and, therefore, the statute is applicable. It cites a 1979 amendment to the attorney's fees statute which provides: "This act shall be liberally construed to promote its underlying purposes." Art. 2226.

■ Even after the 1979 amendment to Article 2226, general expressions can be found in a few Texas Court of Appeals opinions to the effect that statutory provisions authorizing recovery of attorney's fees are to be strictly construed. *See Equitable Trust Co. v. Lyle,* 627 S.W.2d 824 at 826 (Tex.App.—San Antonio 1982, n.r.e.); *Epperson v. Greer,* 626 S.W.2d 884 at 886, 887 (Tex.App.—San Antonio 1981, n.w.h.); *Williams v. Back,* 624 S.W.2d 272 at 277 (Tex. App.—Austin 1981, n.w.h.). For the reasons stated in the margin, we regard the referenced language in these opinions as being of doubtful precedential value on the issue of whether Article 2226, as amended in 1979, should be strictly construed.[19] On the other hand, the Texas Supreme Court

---

(*see* note 2, *supra*), not any character of *excavation* for the tank.

**18.** Article 2226 provides in pertinent part:
"Any person, corporation, partnership, or other legal entity having a valid claim against a person or corporation for services rendered, labor done, material furnished, overcharges on freight or express, lost or damaged freight or express, or stock killed or injured, or suits founded upon a sworn account or accounts, or suits founded on oral or written contracts, may present the same to such person or corporation or to any duly authorized agent thereof; and if, at the expiration of 30 days thereafter, payment for the just amount owing has not been tendered, the claimant may, if represented by an attorney, also recover, in addition to his claim and

costs, a reasonable amount as attorney's fees."

**19.** None of these opinions reference the 1979 amendments to Article 2226, and each of them relies entirely on pre-1979 authority for the statements concerning strict construction. Neither the *Equitable Trust Co.* case nor the *Epperson* case involved Article 2226 in any way. Although the *Back* case did consider Article 2226, the result reached there does not appear to depend on a "strict construction" approach, but rather on a following of prior decisions on a particular substantive issue as to the coverage of Article 2226 (whether filing of suit fulfills the requirement that the creditor "present" the claim to the debtor for 30 days as required by the statute both before and after the 1979 amendments).

has expressly indicated that under the 1979 amendment a liberal, rather than a strict, construction is to be applied its to Article 2226. *See Jones v. Kelley,* 614 S.W.2d 95 at 100 (Tex.1981). *See also Wall v. Wall,* 630 S.W.2d 493 at 497 (Tex.App.—Fort Worth 1982, n.r.e.).[20] Even though the cause of action here appears to have arisen prior to the effective date of the 1979 amendments, we are nonetheless required to apply the "liberal construction" thereby mandated to our analysis of Article 2226 in this case.[21]

We have held that Preload Technology is entitled to recover under the doctrine of promissory estoppel as set forth in § 90 of the Restatement (Second) of Contracts. Comment *d* to § 90 states that "[a] promise binding under this section is a contract. . . ."[22] Moreover, the A.B. & J. bid is sufficiently definite to form the basis of a contract. We are not here dealing with enforcement of promise which by its very nature is too indefinite to have become a contract even if consideration and acceptance were present, as was the situation in *Wheeler v. White, supra.* We have, in effect, implied an enforceable promise on A.B. & J.'s part to keep its bid open, much like an option. Texas appellate courts have allowed recovery of attorney's fees under the "oral or written contracts" clause of Article 2226 on the basis of implied contractual promises, *Guardian Bank v. San Jacinto Savings Ass'n,* 593 S.W.2d 860 at 863 (Tex.Civ.App.—Houston [1st] 1980, n.w.h.), and in litigation to cancel an expired contractual right of first refusal. *Ellis v. Waldrop,* 627 S.W.2d 791 at 798 (Tex.App.—Fort Worth 1982, n.r.e.) (contract suit provision of Article 2226 not limited "to suits for *breach* of contract"). *Cf. Corsicana Petroleum Co. v. Owens,* 110 Tex. 568, 222 S.W. 154 at 155 (1920) (an option is a contract, which is valid and binding if supported by consideration). We likewise note the long standing rule in Texas that ". . . a warran-

---

**20.** "The language of the statute's 1979 amendment, however, requires that we liberally construe the statute to promote its underlying purposes. Art. 2226 (1979); *Jones v. Kelley,* 614 S.W.2d 95 (Tex.1981)." *Id.* 630 S.W.2d at 497.

**21.** The 1979 amendments became effective June 6, 1979, after A.B. & J.'s repudiation, but prior to the June 20, 1979 subcontract with United. However, it is evident that the attorney's fees here sued for were incurred, and the instant suit was commenced, after the 1979 amendments. Section 2 of the 1979 amendatory act provides:

"This Act is remedial in character and is intended to apply to all pending and future actions, regardless of the time of institution thereof or of the accrual of any cause of action asserted."

Under the circumstances, we do not believe that giving effect to section 2 of the 1979 amendatory act, so as to here apply the rule of liberal construction mandated by the 1979 amendments, violates the Texas Constitution's explicit prohibition of any retroactive law. Texas Constitution, Article 1, § 16. The statute in question is, at least in some respects, procedural and remedial. *See, Villiers v. Republic Financial Services,* 602 S.W.2d 566 at 572 (Tex.Civ.App.—Texarkana 1980, n.r.e.). Moreover, Texas cases have not previously spoken to the applicability of Article 2226's provision for attorney's fees in "suits founded on oral or written contracts" to promissory estoppel actions, and so the result of our application of the 1979 "liberal construction" rule does not work a change in the settled Texas law. We note that in *Kelley v. Smith, supra,* the Texas Supreme Court expressly cited section 2 of the 1979 amendatory act, apparently to justify applying the liberal construction mandated by the 1979 amendments to the question of whether a conversation and letter, occurring prior to the 1979 amendments, constituted a sufficient presentment under the statute. *Id.* 614 S.W.2d at 100. *See also Glass Containers Corp. v. Miller Brewing Co.,* 643 F.2d 308 at 314, 315 (5th Cir.1981); *Life Insurance Company of Virginia v. Murray Inv. Co.,* 646 F.2d 224 at 229–230, *modified on rehearing,* 651 F.2d 1090 (5th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1981). The rehearing opinion in *Life Insurance Company of Virginia* conditions its attorney's fees ruling on the Supreme Court of Texas, in the case of *First National Bank in Weatherford v. Exxon Corp.,* 622 S.W.2d 80 (Tex. 1981), which was then pending decision before that Court, not "definitively" holding attorney's fees were unavailable. As it turned out, the Texas Supreme Court's opinion in *Weatherford* did not speak to the attorney's fees issue.

**22.** Williston's treatise on contracts also lends support to the view that a promise binding under § 90 is the equivalent of a contract. Williston refers to creating "original contractual liability on the basis of promissory estoppel." 5 S. Williston & W. Jaeger, *Williston on Contracts* § 692 at 320 (3d ed. 1961).

ty which *the law implies* from the existence of a written contract is as much a part of the writing as the express terms of the contract, and the action to enforce *such a* warranty is governed by the [limitations] statute pertaining to written contracts." *Certain-Teed Products Corporation v. Bell,* 422 S.W.2d 719 at 721 (Tex.1968) (emphasis added). No Texas cases have been cited to us, nor has our own research discovered any, which speak to the question of whether a suit founded on promissory estoppel is within Article 2226's provision respecting "oral or written contracts." However, following the spirit of the foregoing authorities and the legislative injunction that Article 2226 is to be liberally construed,[23] we hold that Preload Technology's promissory estoppel recovery in the instant case is within this provision of Article 2226. Hence, we sustain the award of attorney's fees.

Having held that Preload Technology was properly awarded recovery under the doctrine of promissory estoppel, and that the district court did not err in its award of damages and attorney's fees, the judgment below is affirmed.

AFFIRMED.

---

**23.** We recognize there are limits to "liberal construction," particularly where that doctrine is invoked to alter the meaning given by prior appellate court decisions to particular words in the statute which remain unchanged despite other amendments to the statute enacted after the referenced decisions. *See City of Austin v. North Austin State Bank,* 631 S.W.2d 564 at 568–569 (Tex.App.—Austin 1982, n.w.h.). No comparable considerations are here present.

The provision of Article 2226 allowing recovery of attorney's fees in suits founded on oral or written contracts was added in 1977, *see Villiers v. Republic Financial Services, Inc.,* 602 S.W.2d 566 at 572 (Tex.Civ.App.—Texarkana 1980, n.r.e.), at which time the basically contractual nature of promissory estoppel recovery was generally recognized. Nor do we believe that our interpretation distorts the plain meaning of Article 2226.