TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






ON MOTION FOR REHEARING








NO. 03-05-00430-CV






Bechtel Corporation; MasTec North America, Inc., d/b/a Wilde Construction;

C&S Network Construction and Bechtel Telecommunications, Appellants


v.


CITGO Products Pipeline Company, Appellee






FROM THE DISTRICT COURT OF CALDWELL COUNTY, 22ND JUDICIAL DISTRICT

NO. 01-0-213, HONORABLE TODD A. BLOMERTH, JUDGE PRESIDING





O P I N I O N


 We withdraw our opinion dated October 3, 2008; our supplemental opinion dated
November 7, 2008; and our judgment dated November 7, 2008; and substitute the following in their
place. We overrule CITGO Products Pipeline Company's motion for rehearing.

 A work crew employed by MasTec North America, Inc. d/b/a Wilde Construction
(MasTec/Wilde) ruptured an underground gasoline pipeline owned and operated by CITGO Products
Pipeline Company (CITGO) while excavating for an underground telecommunications line. 
Approximately 390 barrels of gasoline escaped into the surrounding area before the spill could
be contained. CITGO incurred substantial expenses in responding to the spill and remediating
contamination to soil and groundwater. CITGO sued MasTec/Wilde; C&S Network Construction,
a MasTec/Wilde affiliate also involved in the project; and Bechtel Corporation and Bechtel
Telecommunications (collectively, Bechtel), the construction manager on the project. CITGO's
claims were tried to a jury. Based on the verdict and evidence it subsequently heard on attorney's
fees, the district court awarded CITGO a total of $1,461,955.80 in actual damages from
MasTec/Wilde (which had assumed C&S's liabilities in addition to its own), $115,919.48
from Bechtel, prejudgment interest on these amounts, and $295,357.25 in attorney's fees from
MasTec/Wilde. MasTec/Wilde, C&S, and Bechtel have jointly appealed the judgment, bringing
fifteen common issues. For the reasons explained herein, we will reverse and render judgment in
part, reform the judgment and, as reformed, affirm the judgment in part.


BACKGROUND

 The pipeline rupture occurred in May 1999, while appellants were laying an
underground fiber-optic cable for Enron Broadband Services, Inc., as part of Enron Broadband's
"Texas Loop Project." Enron Broadband hired MasTec/Wilde to lay the cable. MasTec/Wilde, in
turn, subcontracted with C&S to work on the project. At all relevant times, MasTec/Wilde and C&S
were each wholly-owned subsidiaries of MasTec, Inc. As their working arrangement was described
at trial, MasTec/Wilde operated "rip crews" who would plow or "rip" trenches in the ground in
which the cable would be placed, while C&S operated "bore crews" that would drill or bore holes
underground as necessary to lay cable beneath obstacles. Enron Broadband also hired Bechtel as its
construction manager for the Texas Loop Project. Bechtel's job included supervising the progress
of the cable-laying operations.

 The nature of the work to be performed on the Texas Loop Project implicated the
Underground Facility Damage Prevention and Safety Act, commonly known as the Texas "one-call"
statute. The current iteration of the one-call statute is codified in chapter 251 of the utilities code. 
See generally Tex. Util. Code Ann. §§ 251.001-.203 (West 2007). At the time this case arose,
however, the one-call statute was contained in article 9033 of the revised civil statutes, Act of
Apr. 23, 1999, 76th Leg., R.S., ch. 62, § 18.17(a), 1999 Tex. Gen. Laws 392, 392-402 ("Former art.
9033"), and the case was tried, submitted, and briefed on appeal with extensive reference to
that version of the statute. Although the two versions are largely identical in substantive respects
material to this proceeding, we will refer to the former article 9033 version for clarity.

 The one-call statute generally requires that any person intending to "excavate" (as
MasTec/Wilde and C&S undisputedly were (1)) to give notice to a "notification center" not earlier
than the 14th day before the date excavation is to begin or later than the 48th hour before the
time excavation is to begin. Former art. 9033, § 9(a). Such notice shall include (1) the name of
the person serving the notice; (2) the "location of the proposed area of excavation," including a street
address, if available, or "an accurate description of the excavation area using any available
designations such as the closest street, road, or intersection"; (3) the name, address, and telephone
number of the excavator or excavator's company; (4) the excavator's "field telephone number," if
available; (5) "the starting date and time and the anticipated completion date of the excavation";
and (6) a statement as to whether explosives will be used. Id. § 9(b). (2) 

 A "notification center" under the one-call statute refers to an entity in which
"operators" of "Class A underground facilities"--which include underground gasoline
pipelines (3)--must "participate," as a condition of doing business in Texas, by providing the
notification center maps, grid locations, or other identifiers indicating the locations of the operator's
underground facilities; updates regarding any changes in such information; and the name and
telephone number of a contact person or persons. Id. § 7(a), (b). The notification center, in turn, is
required, within two hours after receiving a notice of intent to excavate, to transmit the information
received from the excavator to "each member operator that may have an underground facility in the
vicinity of the proposed excavation operation." Id. § 8(b), (c).

 A C&S employee, Clint Ferguson, had the responsibility as "construction locator"
to make the required "one-calls" for both the MasTec/Wilde rip crews and the C&S bore crews
working on the Texas Loop Project. A portion of the project, approximately 8.5 miles in length, was
to run through southern Caldwell County--the Luling area--along the north side of State Highway
90. Work on this portion of the project commenced in April 1999. Beginning as early as April 12,
1999, Ferguson made a series of one-calls to a notification center in advance of and during
the crews' work in Caldwell County. The notification center, in turn, generated notifications to
operators of underground facilities in the area.

 East of Luling, the route of the planned Texas Loop Project excavation crossed a
gasoline pipeline, known as the CASA Pipeline, that was owned and operated by CITGO. As one
of the operators who had underground facilities in the area, CITGO received the notices transmitted
by the notification center in response to Ferguson's one-calls. The information transmitted by the
notification center reflected that the work was to be performed by "C&S Construction" for "Enron,"
and provided Clint Ferguson's name and a phone number as the designated contact. The location
of the proposed excavation was described in these notices as the entire right-of-way along the north
side of Highway 90 running from the Caldwell-Guadalupe County line easterly to the Caldwell-Gonzalez County line.

 The one-call statute requires an operator who receives a one-call notice
must--generally within 48 hours after the time the excavator gave notice to the notification center
of its intent to excavate, or "at a time agreed to by the operator and the excavator"--"mark the
approximate location of its underground facilities at or near the site of the proposed excavation if
the operator believes that marking the location is necessary." Former art. 9033, § 14(a). (4) The statute
also affords an operator the right to be present at an excavation site if it meets certain conditions:

To have a representative present during the excavation, the operator shall contact the
excavator and advise the excavator of the operator's intent to be present during
excavation and confirm the start time of the excavation. If the excavator wants to
change the start time, the excavator shall notify the operator to set a mutually
agreed-to time to begin the excavation. 



Id. § 9(c). Importantly, if "[a]n excavator . . . has fully complied with the Act," the act further
provides, the excavator "may not be liable for damage to an underground facility that was not
marked in accordance with the Act." Id. § 14(c).

 It is undisputed that, on May 7, 1999, a MasTec/Wilde rip crew struck the CASA
Pipeline with a "rip cat,"a piece of machinery, weighing 70,000 to 80,000 pounds and having an 8 to
10 foot blade, used in trenching operations to "rip" or break up ground in advance of a bulldozer
or plow. The impact ruptured the pipeline. Although there was fortunately no explosion,
approximately 390 barrels of gasoline escaped before the spill could be contained. CITGO was able
to recover only about 40 barrels of the gasoline. The escaped gasoline caused contamination to soil
and groundwater. In addition to its lost product and pipeline repairs, CITGO incurred substantial
expenses in responding to and remediating the spill.

 Trial centered largely on whether appellants or CITGO were responsible for rupturing
the pipeline and the extent to which CITGO, C&S, and MasTec/Wilde had each complied with
their respective obligations under the one-call statute. To summarize, CITGO maintained that its
employees and agents had promptly responded to each one-call notification by contacting Ferguson
to inquire about the details of his crews' upcoming work. During these conversations, according
to CITGO, Ferguson was informed that CITGO intended to have a representative present if his
crews excavated near the CASA Pipeline and that Ferguson had agreed that no such work would
occur without prior notice to CITGO. It further claimed that in response to a one-call notification
it received on the morning of May 7, CITGO's Sam Bentley called Ferguson and obtained assurances
that Ferguson's crews would be working several miles to the east of the CASA Pipeline area that
day. Under CITGO's theory, appellants breached these understandings or promises and violated the
one-call statute when the MasTec/Wilde rip crew excavated in the area later that day without prior
notice and without a CITGO representative present.

 Appellants, by contrast, argued that CITGO was to blame for the accident because
it had failed to locate and mark the CASA Pipeline in compliance with the one-call statute and had
even placed stakes at the site that created the misleading impression regarding areas where the crews
could safely work. According to appellants, Ferguson's understanding with CITGO was that he
would contact CITGO before his crews worked within the staked area. Appellants further contended
that the MasTec/Wilde rip crew had hit the CASA Pipeline outside the staked area.

 A pivotal event in both side's versions of the underlying facts was an April 22
meeting between CITGO subcontractor Alton Schulle and Ferguson in the general area of the
CASA Pipeline crossing. Schulle and Ferguson arranged the meeting to discuss excavation near
the pipeline. An understanding of the configuration of the Highway 90 right-of-way and the above-ground features signifying the presence of the pipeline is helpful in understanding the subsequent
events. In this area, Highway 90 runs in roughly an east-west direction. A fenceline, located several
feet north of the highway, ran roughly parallel to the highway. In the fenceline was a metal pipeline
marker, and some fenceposts on either side were topped in white--an indication of a pipeline right-of-way. Near the metal pipeline marker was a vent pipe extending out of the ground. Another vent
pipe appeared on the south side of Highway 90, at an angle southeast of the other vent pipe.

 During this meeting, Schulle attempted to locate the pipeline with an electronic "line
finder." He was unsuccessful. Schulle placed a wooden, flagged stake roughly eight feet south of
the vent pipe on the north side of Highway 90 and, later, two additional stakes--one approximately
17 feet to the west of the first stake, and the other 15 and one half feet to the east of the original
stake. The parties gave competing accounts regarding what Schulle had intended the stakes to
signify. According to Ferguson, after Schulle had attempted unsuccessfully to locate the pipeline
with his line-finder, Schulle approximated the pipeline route by standing on the highway and "lining
up" the vent pipe on each side of the highway with his arms. Based on this estimation, Ferguson
recounted, Schulle placed the middle stake to indicate where he thought the pipeline ran. Ferguson
further testified that he asked Schulle to mark a "safety zone" that his crews would know to avoid
and outside of which they could work. The pair parted ways after their meeting, Ferguson claimed,
with Schulle indicating he would return with a different line-finder and attempt again to locate the
pipeline. Later that day, Ferguson recounted, the two additional stakes had appeared at the site. 
According to Ferguson, although he knew the precise location of the pipeline had not been located,
he understood the three stakes to signify that the pipeline was located somewhere within that area
and that his crews could work safely outside of it.

 Schulle, by contrast, denied that he had ever agreed or purported to mark a "safety
zone" where the pipeline actually ran. He claimed that he had placed the stakes solely to call
attention to the CASA Pipeline right-of-way because the metal pipeline marker in the fence, as
well as the white-topped fenceposts, were obscured by brush. (5) Schulle and other CITGO witnesses
claimed that Ferguson had a clear understanding that the CASA Pipeline had not yet been located
and that it would be necessary to find the line by carefully digging with a backhoe or by hand
to unearth it before the cable project could cross it. Such efforts, CITGO claims it repeatedly
emphasized to Ferguson, should have occurred only when its representatives were present. 
According to CITGO, Ferguson shared that understanding and had agreed that his crews would not
dig near the CASA Pipeline without prior notice to CITGO and without a representative present. 
It claims that, in reliance on this understanding, CITGO did not perceive a need to mark the precise
route of the pipeline, as it anticipated that it would work with Ferguson's crews to unearth the line
at the appointed time. Ferguson, although not disputing that he had promised to give notice to
CITGO before his crews excavated over the pipeline, claimed that this obligation applied only to
work his crews would perform within the staked area.

 On May 6, Schulle and CITGO's Sam Bennett arranged with Ferguson to meet with
Chad Treadwell, the drilling superintendent of the C&S bore crews. Treadwell recounted that the
purpose of the meeting was to discuss how the crew was to bore under or cross the CASA Pipeline. 
He acknowledged that Ferguson had told him that the precise location of the pipeline had not yet
been located. During the meeting, Schulle and Bentley tried to find the pipeline with a line-finder,
again without success. Ferguson, at Bentley's request, dug a trench with a backhoe in front of
the middle stake in an attempt to locate the pipeline. They did not find it. Based on this information,
Bentley concluded that the pipeline was located somewhere to the east of the middle stake. He
permitted the boring crew to dig in the west part of the staked area in order to bore under a TXDOT
gravel or dirt pile to the immediate west. The CITGO agents did not adjust or move the stakes,
however. Bentley explained that he did not believe it necessary to readjust the stakes because
CITGO had been assured that no excavation would take place at the location without prior notice. 
 As it turned out, the portion of the CASA Pipeline north of Highway 90 ran mostly
to the east of the staked area. From the south, the pipeline passes near the vent pipe south of
Highway 90 and crosses at a right angle to the roadway, continues running northward into the
highway right-of-way for several feet, then veers at a sharp angle to the northwest. The pipeline
continues in a northwesterly direction so as to cross the fenceline some distance to the west of the
plane on which it had crossed Highway 90 and from which it bent northwestward. (6) Because of the
configuration of the pipeline, all or substantially all of the pipeline segments south of the stakes lay
to the east of the staked area.

 CITGO presented evidence of how its employees and agents responded to the one-call
notifications generated by Ferguson, including copies of the one-call notifications. On virtually all
is a stamped form eliciting "Person Contacted," "Date," "By," and "Remarks." Each form is
completed by hand. According to the handwritten notations, Ferguson assured CITGO on numerous
occasions that his crews would be working in areas other than near the CASA Pipeline and that he
would contact CITGO before his crews began work near the line. One notification, dated May 5,
1999, at 16:30 (4:30 p.m.), contained handwritten notations indicating that CITGO's "Dennis Elly"
contacted "Clint" and was advised that "they were about 1 mile west of line." Another notification,
dated May 7, at 10:15 a.m., contains handwritten notations indicating that CITGO's Sam Bentley
contacted Clint Ferguson that day and was advised: "This work is east of our line in Harwood area. 
Will not be working near our line today." Harwood is a Caldwell County community located on
Highway 90 several miles east of the CASA Pipeline area. Bentley testified that he obtained these
assurances during the morning of May 7. Ferguson denied giving such assurances.

 Later that same day, at approximately 3:00 p.m., the MasTec/Wilde crew hit the
CASA Pipeline with its rip cat. The operator as well as his supervisor, testified that they had
assumed the three wooden stakes at the site reflected the actual pipeline route, and that no one had
informed them that the pipeline had, in fact, not yet been located. There was also evidence that,
consistent with this belief, the operator had attempted to avoid the staked area and begun ripping at
or near the eastern stake going eastward. Although the precise location where the rip cat struck the
pipeline was disputed, there was evidence that the impact had occurred in an area of the pipeline east
of the staked area.

 CITGO subsequently sued a number of parties for damages it incurred in connection
with the pipeline rupture. It asserted causes of action for negligence, negligence per se, trespass,
breach of contract, and promissory estoppel against MasTec/Wilde and C&S. In addition, CITGO
asserted causes of action for negligent hiring, negligent retention, and negligent supervision
against Bechtel. As to all defendants, CITGO alleged malice and sought exemplary damages. 
MasTec/Wilde, C&S, and Bechtel raised affirmative defenses, including immunity under the one-call
statute.

 The district court submitted jury issues regarding negligence against C&S,
MasTec/Wilde, Bechtel, and CITGO; promissory estoppel against C&S and MasTec/Wilde; trespass
against C&S and MasTec/Wilde; and appellants' affirmative defense of immunity under the one-call
statute. Predicated on affirmative findings as to either negligence or trespass as to one or more
defendants, the court also submitted whether such conduct had been committed with malice. The
jury found that the negligence of all parties had proximately caused the pipeline rupture,
and apportioned responsibility 30 percent to MasTec/Wilde, 50 percent to C&S, 10 percent to
Bechtel, and 10 percent to CITGO. The jury awarded $1,159,194.75 in past negligence damages and
$668,250.00 in future negligence damages. The jury failed to find that either C&S or MasTec/Wilde
had committed trespass or that any defendant had acted with malice in committing negligence. As
for promissory estoppel, the jury found that CITGO had foreseeably relied to its detriment on
a promise by both MasTec/Wilde and C&S and awarded $871,413.99 in past damages and
$668,250.00 in future damages. CITGO had requested attorney's fees under its promissory estoppel
theory, and the parties subsequently tried the amount of such fees to the district court.

 Regarding appellants' claims of immunity under the one-call statute, the district court
instructed the jury by quoting pertinent portions of the statute and submitting, over objection, a series
of three questions that followed a burden-shifting framework: (1) did MasTec/Wilde and C&S each
"give the notice required by Section 9(a) and 9(b) of the Texas One-Call Statute?" (i.e., the one-call
notice); (2) if so, "Did CITGO respond in accord with Section 9(c) [regarding the right to be present
at the excavation] and 14 [regarding marking its facilities] of the Texas One-Call Statute?"; and (3) if
so, did MasTec/Wilde and C&S each "then respond in accord with requirements for excavators as
described in Section 9(c) of the Texas One-Call Statute." In the first question, the jury found in
the affirmative as to both MasTec/Wilde and C&S. In the second, the jury found in the affirmative. 
In the third question, the jury found that neither MasTec/Wilde nor C&S had responded in accord
with section 9(c).

 The district court rendered judgment on the verdict. Because MasTec/Wilde had
assumed all of C&S's liabilities, the court imposed judgment against MasTec/Wilde for the damages
the jury had awarded against both affiliates. Against MasTec/Wilde, the district court awarded
CITGO $927,355.80 in past damages and $534,600.00 in future damages, amounts reflecting the
total percentages of responsibility that the jury had imposed against MasTec/Wilde and C&S for
negligence (30 percent + 50 percent = 80 percent) applied to the jury's awards of past and future
negligence damages. Similarly, the district court awarded CITGO $115,919.48 in past damages and
$66,825.00 in future damages from Bechtel, reflecting the 10 percent of negligence responsibility
that the jury had apportioned to that party. Further, based on the jury's promissory estoppel findings
against MasTec/Wilde and C&S, the district court awarded CITGO $295,357.25 in trial-level
attorney's fees, plus a total of another $75,000 in conditional appellate attorney's fees. Finally the
court awarded prejudgment interest of $236,629.18 against MasTec/Wilde and $29,577.46 against
Bechtel, and assessed court costs against MasTec/Wilde 

 MasTec, C&S, and Bechtel appealed.


ANALYSIS

 Appellants bring a total of fifteen issues that can be categorized into four groups:
(1) issues concerning the affirmative defense of immunity under the one-call statute; (2) an issue
challenging the imposition of negligence liability against them; (3) issues contesting the amount of
past and future damages awarded in the judgment; and (4) issues attacking the attorney's fee award
and the underlying jury findings regarding promissory estoppel.


One-call statute

 As noted, the one-call statute has provided at all relevant times that "[a]n excavator
who has fully complied with this Act may not be liable for damage to an underground facility
that was not marked in accordance with this Act." Former art. 9033, § 14(c). The district court
submitted the fact issues controlling the application of this defense in Question 12 of the charge. In
Question 12, the court instructed the jury as follows:


You are instructed that Texas Underground Damage Prevention and Safety Act,
commonly known as the "Texas One-Call Statute," states as follows:



SECTION 9: DUTY OF AN EXCAVATOR.


(a) A person who intends to excavate shall notify a notification center not earlier
than the 14th day before the date the excavation is to begin or later than the
48th hour before the time the excavation is to begin, excluding Saturdays,
Sundays, and legal holidays. Provided, however, if an excavator makes a
Saturday notification, the excavator may begin the excavation the following
Tuesday at 11:59 a.m. unless the intervening Monday is a holiday. If the
intervening Monday is a holiday, the excavator may begin the excavation the
following Wednesday at 11:59 a.m.



(b) The notice required under this section shall include:


 (1) the name of the person serving the notice;

 (2) the location of the proposed area of excavation, including;

 (A) the street address, if available, and the location of the
excavation at the street address; or

 (B) if there is no street address, an accurate description using any
available designations such as the closest street, road, or
intersection;

 (3) the name, address, and telephone number of the excavator or the
excavator's company;

 (4) the excavator's field telephone number, if one is available;

 (5) the starting date and time and the anticipated completion date of
excavation; and

 (6) a statement as to whether explosives will be used.


(c) To have a representative present during the excavation, the operator shall
contact the excavator and advise the excavator of the operator's intent to be
present during excavation and confirm the start time of the excavation. If the
excavator wants to change the start time, the excavator shall notify the
operator to set a mutually agreed-to time to begin the excavation. 



SECTION 14. DUTY OF OPERATOR TO PERSON EXCAVATING.


(a) Not later that the 48th hour after the time the excavator give[s] to the
notification system notice of intent to excavate, excluding Saturdays,
Sundays, and legal holidays, 11:59 a.m. on the Tuesday following a Saturday
notification unless the intervening Monday is a holiday, or at a time agreed
to by the operator and the excavator, each Class A underground facility owner
shall mark the approximate location of its underground facilities at or near the
site of the proposed excavation if the operator believes that marking the
location is necessary. 

(b) An operator shall refer to the American Public Works Association color
coding standards when marking.


(c) An excavator who has fully complied with this Act may not be liable for
damage to an underground facility that was not marked in accordance with
the Act.



With the exception of two textual differences that are not material to this case, these instructions
tracked verbatim sections 9 and 14 of former article 9033, the version of the one-call statute
applicable to this case. (7) See, e.g., Borneman v. Steak & Ale of Tex., 22 S.W.3d 411, 413 (Tex. 2000)
("As a general rule, when a statutory cause of action is submitted, the charge should 'track the
language of the provision as closely as possible.'") (quoting Spencer v. Eagle Star Ins. Co. of Am.,
876 S.W.2d 154, 157 (Tex. 1994)).

 Following these instructions, the district court submitted the following question: 


QUESTION NO. 12A


Did the Defendants listed below give the notice required by Section 9(a) and 9(b) of
the Texas One-Call Statute?


Answer "Yes" or "No" as to each:


MasTec/Wilde _____


C&S _____



Predicated on an affirmative finding as to either defendant, the jury was instructed to answer the
following:




QUESTION NO. 12B


Did CITGO respond in accord with Section 9(c) and 14 of the Texas One-Call
Statute?


Answer "Yes" or "No":



Predicated on an affirmative answer to 12B, the jury was instructed to answer the following:


QUESTION NO. 12C


Did the Defendants listed below then respond in accord with requirements for
excavators as described in Section 9(c) of the Texas One-Call Statute?


Answer "Yes" or "No" as to each:


MasTec/Wilde _____


C&S _____



The jury found in the affirmative as to both MasTec/Wilde and C&S in Question 12A--that
each had "give[n] the notice required by Section 9(a) and 9(b) of the Texas One-Call Statute"--and
found in Question 12B that CITGO had "then respond[ed] in accord with Section 9(c) and 14 of
the Texas One-Call Statute," but found in Question 12C that neither MasTec/Wilde nor C&S had
"then respond[ed] in accord with requirements for excavators as described in Section 9(c) of the
Texas One-Call Statute." Based on these findings, the district court did not give effect to appellants' 
affirmative defense of immunity under the one-call statute.

 At trial, appellants objected to Question 12A, 12B, and 12C on the ground that "the
special interrogatory structure of the question does not comply with broad form requirements that
are currently dictated by the Texas rules and courts." They tendered what they regarded as a
substantially correct version of the question containing the following interrogatories:


Did the Defendants listed below fully comply with the Texas One-Call Statute?

Answer "Yes" or "No" for each of the following:

C&S _______

MasTec/Wilde _______


Predicated on an affirmative answer as to either defendant, the jury would then have answered the
following question:


Did CITGO mark its pipeline in accordance with the Texas One-Call Statute?

Answer "Yes" or "No"

________ (8)


Appellants bring this complaint forward in their seventh issue on appeal, arguing that the
district court abused its discretion in failing to submit the controlling issues regarding immunity
under the one-call statute in broad form. They further contend on appeal that Question 12C "did not
track the statutory language at all" or "implied to the jury that Defendants were obligated to respond
under Section 9(c)." We cannot conclude that the district court abused its discretion.

 Our analysis of appellants' contentions relating to the one-call statute turn, in the
first instance, on statutory construction. Statutory construction presents a question of law that we
review de novo. See State v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective
in statutory construction is to give effect to the legislature's intent. Id. We seek that intent "first
and foremost" in the statutory text. Lexington Ins. Co. v. Strayhorn, 209 S.W.3d 83, 85 (Tex. 2006). 
We consider the words in context, not in isolation. State v. Gonzalez, 82 S.W.3d 322, 327
(Tex. 2002). We rely on the plain meaning of the text, unless a different meaning is supplied by
legislative definition or is apparent from context, or unless such a construction leads to absurd
results. City of Rockwall v. Hughes, 246 S.W.3d 621, 625-26 (Tex. 2008) (citing Texas Dep't of
Transp. v. City of Sunset Valley, 146 S.W.3d 637, 642 (Tex. 2004); Taylor v. Firemen's &
Policemen's Civil Serv. Comm'n of City of Lubbock, 616 S.W.2d 187, 189 (Tex. 1981); University
of Tex. Sw. Med. Ctr. v. Loutzenhiser, 140 S.W.3d 351, 356 (Tex. 2004)); see Tex. Gov't Code Ann.
§ 311.011 (West 2005) ("[w]ords and phrases shall be read in context and construed according to
the rules of grammar and common usage").

 Section 14(c) of the one-call statute states that "[a]n excavator who has fully complied
with this Act may not be liable for damage to an underground facility that was not marked in
accordance with this Act." Former art. 9033, § 14(c). Section 14(c) thus provides immunity from
"liability for damage to an underground facility" if an excavator can prove two elements: (1) the
"excavator . . . has fully complied with this Act"; and (2) the underground facility "was not marked
in accordance with this Act." The term "fully complied" plainly denotes complete compliance
with the one-call statute in all respects, as contrasted with partial compliance or substantial
compliance. See United States v. Locke, 471 U.S. 84, 100-01 (1985) (discussing the concept of
substantial versus full compliance in the context of statutory deadlines); CenterPoint Energy
Houston Elec., LLC v. Gulf Coast Coalition of Cities, 252 S.W.3d 1, 15 (Tex. App.--Austin 2008,
pet. filed) ("We presume that every word was deliberately chosen and that excluded words were left
out on purpose.") (citing USA Waste Servs. of Houston, Inc. v. Strayhorn, 150 S.W.3d 491, 494
(Tex. App.--Austin 2004, pet. denied)). Whether or how an excavator "fully complied" with the
one-call statute begins with section 9 of the statute, titled "Duty of an excavator." Section 9(a), as
discussed, requires an excavator to give at least 48 hours notice to a notification center of its intent
to excavate, while section 9(b) specifies the content of such notifications. Id. § 9(a), (b). Question
12A appropriately inquired whether MasTec/Wilde and C&S each gave "the notice required by
Section 9(a) and 9(b) of the Texas One-Call Statute?"

 A one-call notice in compliance with section 9(a) and (b), in turn, triggers an
operator's duty under section 14 to "mark the approximate locations of its underground facilities
at or near the site of the proposed excavation." Id. § 14(a), (b). Section 9(c) also provides that
an operator has a right "[t]o have a representative present during the excavation" if the
operator--presumably in response to the one-call notification it received after the excavator
complied with section 9(a) and (b)--"contact[s] the excavator" and (1) advises it of the operator's
"intent to be present during excavation" and (2) "confirm[s] the start time of the excavation." Id. 
§ 9(c). Conditioned upon an affirmative finding in Question 12A that one-call notification was
given, Question 12B submitted both of the operator's duties, inquiring whether CITGO "respond[ed]
in accord with Section 9(c) and 14 of the Texas One-Call Statute." By answering "yes" to this
conjunctive submission, the jury found that CITGO complied with both the marking requirements
of section 14 and the conditions for invoking its right to be present at the excavation under
section 9(c).

 If an operator invokes its right to be present during the excavation by meeting
the conditions under section 9(c), as the jury found here, the excavator then has a mandatory duty
not to "change the start time" without "notify[ing] the operator to set a mutually agreed to time." 
See id. § 9(c). Whether MasTec/Wilde or C&S each complied with these duties was the
focus of Question 12C. That question was conditioned upon an affirmative response in
Question 12B--which, again, incorporated an affirmative finding that CITGO had invoked
section 9(c)--and inquired whether each "then respond[ed] in accord with requirements for
excavators as described in Section 9(c) of the Texas One-Call Statute."

 The burden-shifting, conditioned sequence that the district court employed in
Question 12 generally tracked the statutory framework and submitted the fact issues whose
resolution controlled whether MasTec/Wilde and C&S were entitled to immunity from liability
under the one-call statute in this case. Question 12 did deviate from the statute, however, in its
conditioning of Question 12C (MasTec/Wilde and C&S's compliance with section 9(c)) on a
conjunctive finding in Question 12B that incorporated findings that CITGO complied with
both section 9(c) and section 14. It is CITGO's compliance with section 9(c) that triggered
MasTec/Wilde and C&S's duties under section 9(c), regardless whether CITGO also complied
with section 14. Although CITGO's compliance with section 14 went to another element of
appellants' immunity defense, it did not control whether appellants' duties arose under section 9(c). 
Question 12C thus would have more closely tracked the one-call statute if it had been predicated
solely upon a finding that CITGO had complied with section 9(c).

 Appellants emphasize this feature of Question 12 in their motion for rehearing. 
However, their objection at trial was that "the special interrogatory structure of the question does
not comply with broad form requirements that are currently dictated by the Texas rules and courts." 
Appellants tendered a proposed submission with a single broad-form question regarding
MasTec/Wilde and C&S's compliance with the one-call statute--"Did the Defendants listed below
fully comply with the Texas One-Call Statute?"--followed by an issue inquiring whether CITGO
marked its pipeline as required by section 14. The district court did not abuse its discretion in
refusing to submit the controlling issues in the broad-form manner appellants proposed.

 Although trial courts must submit fact issues to the jury in broad form "whenever
feasible," Tex. R. Civ. P. 277, "'it is not always practicable to submit every issue in a case broadly,'
and broad-form submissions cannot be used to broaden the harmless error rule to deny a party
the correct charge for which it otherwise would be entitled." Romero v. KPH Consolidation, Inc.,
166 S.W.3d 212, 230 (Tex. 2005) (quoting Harris Co. v. Smith, 96 S.W.3d 230, 235 (Tex. 2002)). 
Here, broad-form submission as proposed by appellants was not practicable for two reasons. First,
appellants' proposal omitted any issue or instruction for the jury to determine whether CITGO had
complied with its duties under section 9(c) to notify appellants that it desired to be present during
the excavation. CITGO had the burden of proving and obtaining a finding that it had complied with
section 9(c) before appellants would be required to prove that they complied with their duties under
section 9(c). CITGO would have waived this issue if it failed to obtain that finding. See Tex. R.
Civ. P. 279. As discussed below, there was legally sufficient evidence that CITGO complied with
section 9(c), and it was entitled to have this issue submitted. See Tex. R. Civ. P. 278.

 Second, even if the proposed submission included proper instructions regarding
CITGO's compliance with section 9(c), appellants' proposed issue as to whether C&S and
MasTec/Wilde "fully complied" with the one-call statute would have subsumed three issues: 
(1) whether appellants complied with section 9(a) and (b); (2) whether CITGO complied with
section 9(c), so as to give rise to appellants' duties under that provision; and (3) whether appellants
complied with section 9(c). An affirmative finding on such an issue would leave an appellate court
unable to determine whether the jury found that (1) appellants complied with sections 9(a) and (b)
and CITGO did not comply with section 9(c) so as to give rise to appellants' duties under that
provision, or (2) appellants complied with sections 9(a) and (b), CITGO complied with section 9(c),
and appellants complied with section 9(c). At time of trial, the district court had little, if any, case
law guidance regarding the nature of the duties imposed by section 9(c) on either CITGO or
appellants under the present facts, and there was room for debate regarding these issues. (9) 
Appellants' proposed broad-form submission thus presented a risk of commingling potentially valid
and invalid theories. See Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 388 (Tex. 2000). Under
these circumstances, the district court did not abuse its discretion in rejecting a broad-form approach. 


 Furthermore, we fail to see any harm to appellants from the form of Question 12 as
submitted. The failure to submit a question in broad form does not necessarily constitute harmful
error if the charge submits the controlling fact issues and incorporates correct legal standards. See
H.E. Butt Grocery Co. v. Warner, 845 S.W.2d 258, 259-60 (Tex. 1992). Question 12 submitted to
the jury the factual issues controlling appellants' immunity under the one-call statute in this
case--whether (1) MasTec/Wilde and C&S complied with sections 9(a) and (b); (2) whether CITGO
complied with section 9(c) so as to give rise to appellants' duties under that provision, and whether
MasTec/Wilde and C&S complied with those duties; and (3) whether CITGO complied with
section 14. Question 12 also incorporated the correct substantive legal standards governing these
issues, with the exception of predicating Question 12C on affirmative findings in 12B that
CITGO had complied with both section 9(c) and section 14. Appellants were not harmed by this
conditioning instruction, however, because the jury--rightly or wrongly--reached and answered
Question 12C anyway. This was to appellants' benefit. Because the jury found in Question 12B that
CITGO had complied with section 9(c) so as to invoke appellants' duties under that provision,
appellants could prevail on their immunity defense only if they obtained favorable findings in
Question 12C that MasTec/Wilde and C&S had complied with section 9(c)--otherwise, appellants
would not have established that they "fully complied' with the one-call statute. Although the jury
ultimately made findings in Question 12C adverse to appellants, appellants would have waived their
immunity defense altogether if they had failed to obtain those findings. See Tex. R. Civ. P. 279. We
overrule appellants' seventh issue.

 In their fifth issue, appellants argue that the district court erred in failing to disregard
the jury's answers to Questions 12B and 12C and render judgment that CITGO take nothing. 
Appellants argue principally that the evidence conclusively establishes that they complied with
the notification requirements of section 9(a) and (b) and that there is legally and factually insufficient
evidence that CITGO complied with section 14 by properly marking the CASA Pipeline. Again,
Question 12B submitted whether CITGO had complied with its duties under both section 9(c)
and section 14. By finding in the affirmative, the jury found that CITGO had complied with both
sets of duties. It is not clear that appellants are challenging the evidence supporting the jury's other
finding in Question 12B that CITGO complied with section 9(c) so as to give rise to MasTec/Wilde
and C&S's duties under that provision. To the extent appellants are challenging the jury's finding
regarding CITGO's compliance with section 9(c), we conclude there is legally and factually
sufficient evidence to support it.

 When a party challenges the legal sufficiency of the evidence supporting an issue on
which the opposing party had the burden of proof, the party must demonstrate: (a) the complete
absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to
the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no
more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact.
City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal sufficiency review
of the evidence, a court must consider all of the evidence in the light most favorable to the fact
finding and indulge every reasonable inference that would support it. City of Keller, 168 S.W.3d
at 822.

 When reviewing a challenge to the factual sufficiency of the evidence supporting a
vital fact that, we must consider, weigh, and examine all of the evidence in the record, both
supporting and against the finding, to decide whether the verdict should be set aside. Plas-Tex, Inc.
v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989); Pool v. Ford Motor Co., 715 S.W.2d 629, 635
(Tex. 1986). When a party attacks the factual sufficiency of an adverse finding on an issue on which
the opposing party has the burden of proof, we should set aside the verdict only if the evidence
supporting the jury finding is so weak as to be clearly wrong and manifestly unjust. See Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).

 To prove that it had complied with section 9(c), CITGO presented evidence that, in
response to one-call notifications and in a face-to-face meeting, it had repeatedly informed Clint
Ferguson of its intent to be present at any excavation near the CASA Pipeline and that Ferguson
and CITGO had an ongoing understanding that his crews would not excavate near the CASA
Pipeline without prior notice and a CITGO representative present. Further, in the context of this
understanding, CITGO's Sam Bennett testified that he responded to a one-call notification during
the morning of the accident by calling Ferguson and obtaining Ferguson's assurances that his crews
would be working several miles away from the pipeline that day. In terms of section 9(c), CITGO
had contacted Ferguson, informed Ferguson of its intent to be present when his crews were
excavating near the CASA Pipeline, and confirmed that there would be no "start time" for such
excavation that day. (10) Although Ferguson disputed Bennett's version of this conversation, the jury
could have reasonably credited Bennett's account, and it was the jury's province to resolve the
conflict in the manner it did. See City of Keller, 168 S.W.3d at 819, 822 (we may not substitute our
judgment for the jury's, and we must defer to the jury's determinations of the credibility of the
witnesses, the weight to be given the testimony, and the resolution of evidentiary conflicts.) The
evidence was legally and factually sufficient to support the jury's finding in Question 12B that
CITGO had complied with section 9(c).

 In light of the jury's finding that CITGO had complied with section 9(c), appellants
would not have "fully complied" with the one-call statute unless they also complied with their duties
under section 9(c). Question 12C submitted whether MasTec/Wilde or C&S "then respond[ed] in
accord with requirements for excavators as described in Section 9(c) of the Texas One-Call Statute." 
Appellants had the burden of proof on these issues. When a party challenges the legal sufficiency
of the evidence supporting an adverse finding on an issue on which it has the burden of proof,
that party must demonstrate on appeal that the evidence conclusively established, as a matter of law,
all vital facts in support of the issue. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001). 
When a party attacks the factual sufficiency of an adverse finding on an issue on which he has
the burden of proof, he must demonstrate on appeal that the adverse finding is against the great
weight and preponderance of the evidence. Id. The evidence is legally and factually sufficient, if
not undisputed, that CITGO was never notified that a MasTec/Wilde rip crew would, contrary to
Ferguson's statements, be excavating near the pipeline after all. Appellant do not dispute that this
evidence supports the jury's findings in 12C beyond asserting that "the jury's answer to 12C should
be disregarded " because "[t]hough the jury found that Defendants failed to notify the pipeline
operator of the excavation start time, the record shows Defendants gave numerous notifications
within the time frame required by statute." In support, appellants cite to the copies of the one-call
notifications in evidence, which, it emphasizes, "Citgo conceded that it received." Although copies
of the one-call notifications may be probative of whether MasTec/Wilde or C&S complied with the
notification requirements of section 9(a) or (b), so as to support the jury's findings in Question 12A,
the jury's finding in 12C instead turned on the nature of the communications between CITGO and
Ferguson after CITGO's receipt of Ferguson's one-call notifications.

 Appellants also argue that we must disregard the jury's findings in Question 12C
because (1) the evidence is legally and factually sufficient to support the jury's finding in
Question 12B that CITGO complied with section 14; and (2) Question 12C was predicated on the
jury's conjunctive finding in 12B that CITGO complied with both section 9(c) and section 14. Even
assuming these contentions to be valid, however, the remaining jury findings would still support the
judgment, for reasons we have previously suggested. Because the jury found in Question 12B that
CITGO had complied with section 9(c) so as to invoke appellants' duties under that provision,
appellants could not prevail on their immunity defense--i.e., that they "fully complied" with the one-call statute--unless they obtained findings in Question 12C that they complied with section 9(c). 
Consequently, if the jury's adverse findings in Question 12C were disregarded, this would not aid
appellants, but would instead result in the waiver of their immunity defense. See Tex. R. Civ. P.
279. Alternatively, because factually sufficient evidence supports them, findings that MasTec/Wilde
and C&S failed to comply with section 9(c) would be deemed in support of the judgment. See id. 
We overrule appellants' fifth issue. (11)

 Finally, in their sixth issue, appellants urge that CITGO's recovery should be barred
as a matter of "public policy" because, they again urge, CITCO failed to mark the CASA Pipeline
in compliance with section 14 of the one-call statute. Appellants invoke common-law concepts that
have been applied to bar recovery under an insurance policy where the covered loss was caused
by the policy beneficiary's own intentional conduct. See Norman v. State Farm Fire & Cas. Co.,
804 F.2d 1365, 1366 (5th Cir. 1986). Equating CITGO's alleged failure to mark the CASA Pipeline
as required by section 14 to such conduct as arson, appellants reason that CITGO should similarly
be barred from "benefitting from its own wrongdoing" by recovering damages from the pipeline
rupture under negligence and promissory estoppel theories. Appellants cite no authority for
extending the concept of Norman in this manner, and we are aware of none. We also observe that
Texas law already accounts for the type of "wrongdoing" of which appellants complain through
proportionate responsibility. Here, the jury attributed ten percent of the negligence that proximately
caused the pipeline rupture to CITGO, and reduced its recovery accordingly.

 We further observe that giving effect to the common-law "public policy" limitations
on which appellants rely would yield a result inconsistent with the legislative public policy
judgments reflected in the one-call statute. The legislature--the principal arbiter of public policy
under our tripartite system of government--has not seen fit to provide excavators immunity based
solely on the failure of an operator to mark its underground facilities. Instead, the excavator must
also "fully comply" with the statute. See former art. 9033, § 14(c). The net effect of appellants'
analysis would be to judicially eliminate or circumvent one of the two statutory elements of one-call
act immunity. Finding no support for such a holding in either the one-call statute or Texas common
law, we overrule appellants' sixth issue.


Negligence liability

 In their fourth issue, appellants contend that the jury's apportionment of fault under
the negligence findings was against the great weight and preponderance of the evidence and was
manifestly unjust. As discussed, the jury apportioned responsibility 50 percent to C&S, 30 percent
to MasTec/Wilde, 10 percent to Bechtel, and 10 percent to CITGO. Appellants urge that "the great
weight and preponderance of the evidence establishes that CITGO was at least 51% at fault," a
percentage that would bar CITGO from recovering in negligence. See Tex. Civ. Prac. & Rem. Code
§ 33.001 (West 2008).

 If a jury's verdict is so against the great weight and preponderance of the evidence
as to be manifestly unjust, we must reverse the judgment. See In re King's Estate, 244 S.W.2d 660,
661 (Tex. 1951). In determining whether a finding was against the great weight and preponderance
of the evidence, the court of appeals must consider and weigh all of the evidence, and can set aside
a finding only if the evidence is so weak that it is clearly wrong and unjust. Dow Chem. Co.,
46 S.W.3d at 241. Appellants emphasize evidence that CITGO received one-call notifications
regarding the ongoing Texas Loop Project excavation, that CITGO never located or marked
the actual location of the CASA Pipeline, that Schulle placed and left in place stakes that created a
misleading impression regarding the pipeline's location, and that CITGO and not appellants had
access to the maps and other information from which the pipeline's actual location could have
been determined. Indeed, CITGO does not challenge the jury's finding that its was contributorily
negligent.

 However, the jury also heard evidence CITGO and Ferguson had an understanding
that Ferguson's crews would not excavate near the CASA Pipeline without prior notice to CITGO
and CITGO's representatives being present, a factor that the jury reasonably could have considered
in drawing inferences from the acts or alleged omissions of CITGO personnel that appellants
attack. (12) There was also evidence that both Ferguson and Bechtel employees had been informed that
CITGO had not yet located the pipeline's precise location. Nonetheless, both the rip cat operator and
his supervisor testified that they had not been informed the pipeline had not been located. The jury
also heard evidence of a near-miss with another underground facility on May 6 that the jury could
reasonably have concluded was caused by similar communication breakdowns between Ferguson
and his crews. We cannot conclude that the jury's failure to allocate at least 51 percent of fault to
CITGO is against the great weight and preponderance of the evidence and is manifestly unjust. See
Rosell v. Central W. Motor Stages, Inc., 89 S.W.3d 643, 659-60 (Tex. App.--Dallas 2002,
pet. denied) (the determination of negligent parties' proportionate responsibility is a matter within
the jury's sound discretion).

Negligence damages

 "Tulsa overhead"

 In their third issue, appellants attack the jury's award of past negligence damages on
the basis that there is legally and factually insufficient evidence to support the full amount of that
award. At trial, CITGO presented spreadsheets, backup documentation, and testimony from a safety
environmental manager, Kenny Holtgreve, indicating that CITGO had incurred a total of $1,159,194
in expenses from the pipeline rupture and gasoline spill until date of trial. The jury ultimately
awarded this entire amount as past negligence damages.

 CITGO's calculations presented to the jury included roughly $80,000 it claimed
in emergency response costs, $766,000 in remediation costs, $10,000 in lost product, and $15,000
in payments to the adjoining landowner to gain access to the property. The remaining
amount--$287,780.76--was a figure intended to reflect the value of employee time, equipment,
materials, and other overhead that CITGO had to divert from normal business operations
when responding to the large gasoline spill. It is only the latter component of past negligence
damages--which the parties respectively term "project management expenses" or "Tulsa
overhead" (13)--that appellants challenge.

 Holtgreve testified regarding the bases for CITGO's claim for $287,780.76 in "Tulsa
overhead." He testified that CITGO incurred significant additional internal costs when having to
divert employees and company resources from normal business operations to respond to the spill.
Holtgreve, for example, observed that "[o]ne hundred percent of my time" was devoted to the project
in the spill's immediate aftermath. He added that "people in the operations area in the field," such
as "Sam Bentley and his people" were involved in the project, as well as "accounting people
who would have to keep track of the invoices," "administrative people who would get the invoices
to process them," and "other managers who would manage, oversee what we did." As Holtgreve put
it, "[i]f the person's time is allocated to do this project instead of his normal job, this is time lost by
Citgo. Therefore, that is money that Citgo has lost because of the event." Holtgreve further noted
that the work required increased use of CITGO telephones and other equipment. To reflect the value
of these lost company resources, Holtgreve explained, CITGO imposed a percentage surcharge
or mark-up in the same manner that it did when performing projects, such as relocating pipelines,
for a third party.

 Holtgreve explained that on such projects, CITGO would ordinarily charge a
management fee of 34 percent that "covers the staff type of functions, the accounting functions,
the legal functions, the human resource functions, management functions that are not directly
associated to Citgo, because Citgo works for Citgo and we are not in the business of doing projects
for other companies." Holtgreve opined that such fees were "a common practice in the industry." 
To approximate the value of its employees' time and overhead expended in the spill response and
remediation, CITGO, essentially treating the gasoline spill as if it was a project being performed for
a third party, multiplied those costs by 34 percent, yielding the $287,780.76 figure.

 Appellants argue that there is legally and factually insufficient evidence that CITGO
incurred $287,780.76 in lost employee time and resources. They point out that CITGO did not
attempt to quantify or prove the actual amount or value of its lost overhead even though Holtgreve
acknowledged that CITGO's accounting department could have tracked those figures. As for the
basis of the 34 percent mark-up, Holtgreve conceded that he had no personal knowledge regarding
how that percentage figure had been derived, explaining only that "[i]t's a number that [CITGO] had
generated in the past based off of some study that [it] had done somewhere in the past" and "was
associated with the projects when I started dealing with them." CITGO did not elaborate further
regarding the origins of the "Tulsa overhead."

 CITGO responds that there was sufficient evidence that CITGO incurred substantial
lost employee time and resources when responding to the pipeline rupture. It also suggests that
appellants waived any complaint regarding the origins of the "Tulsa overhead" because they did not
preserve objections to the admission of Holtgreve's testimony or the submission of a broad-form
question on negligence damages. Question 3 of the charge asked: "What sum of money, if paid not
in cash, would fairly and reasonably compensate CITGO for the damages incurred in the past
resulting from the rupture of the CASA Pipeline." The jury was instructed to consider the reasonable
costs in Caldwell County, Texas (1) "to restore the CASA Pipeline to the condition it was in
immediately before the occurrence in question" and (2) "to respond to and remediate the spill,"
including "reasonable and necessary clean-up costs and monitoring expenses." Because Holtgreve's
testimony regarding lost employee time and the 34 percent mark-up was in evidence and the
charge permitted the jury to consider it, CITGO reasons, appellants cannot now complain that
the jury did so.

 In this regard, both parties emphasize that appellants objected to and obtained an
instruction in the past promissory estoppel damages question, "Do not include Tulsa overhead." In
response to appellants' objection, the district court stated that it "didn't hear any evidence" of "what
the 34 percent was" or how this fee CITGO charged to third parties was probative of damages
CITGO incurred in connection with the spill. However, appellants did not request a similar
instruction in the otherwise-parallel question for past negligence damages. As it turned out, the jury,
while awarding $1,159,194.75 in past negligence damages, awarded only $871,413.99 in past
promissory estoppel damages--a difference of $287,780.76, corresponding precisely to the amount
of "Tulsa overhead."

 On this record, sufficient evidence would support the jury's award of $1,159,194.75
in past negligence damages only if there was sufficient evidence that CITGO incurred at least
$287,780.76 in "Tulsa overhead." The evidence supports no more than speculation as to that fact. 
Although Holtgreve did allude generally to "people in the operations area in the field," "accounting
people," "administrative people," and "other managers" having to devote all of their time to the
project for some unspecified period after the accident, he provided no basis to quantify the value of
that time, such as salaries and the like, other than the 34 percent mark-up that CITGO used on third-party projects. CITGO's methodology in determining that percentage was never explained. Nor
does CITGO refer us to any other evidence in the record from which the jury reasonably could have
inferred that the company had incurred at least $287,780.76 in lost employee time or overhead in
connection with the pipeline rupture. Consequently, the evidence is legally insufficient to support
the jury's award of the full amount of $1,159,194.75 in past negligence damages.

 Appellants do not dispute, however, that legally and factually sufficient
evidence supports the award of the other components of past negligence damages, which total
$871,413.99. Where, as here, we conclude that there is insufficient evidence to support the full
amount of a damages award but sufficient evidence to support a lesser award, we may suggest a
remittitur. See Spring Windows Fashions Div., Inc. v. The Blind Maker, 184 S.W.3d 840, 889-90 (Tex. App.--Austin 2006, pet. granted, remanded by agr.); Tex. R. App. P. 46.3. The party
prevailing in the trial court must be given the option of accepting the remittitur or having the case
remanded for a new trial. Spring Windows, 184 S.W.3d at 889-90. Accordingly, in our opinion on
original submission, we suggested a remittitur of $287,780.76, the difference between the jury's
award of $1,159,194.75 in past negligence damages and the amount of such damages that the
evidence supports.

 In response to our suggestion of remittitur, CITGO filed with the district clerk a
remittitur of $287,780.76 of the past negligence damages awarded in the district court's judgment. 
Accordingly, we reform this portion of the district court's judgment to award CITGO $871,413.99
in past negligence damages instead of $1,159,194.75. Similarly, as we have overruled appellants'
challenges to the portions of the district court's judgment apportioning 80 percent responsibility to
MasTec for CITGO's negligence damages and 10 percent responsibility to Bechtel, we reform the
district court's judgment to award CITGO $697,131.19 in past negligence damages from MasTec
rather than $927,355.80, and $87,141.40 in past negligence damages from Bechtel rather than
$115,919.48. We likewise reform the district court's award of prejudgment interest on these
amounts to award CITGO $178,081.64 from MasTec and $22,260.21 from Bechtel.


 Future damages

 In their second issue, appellants argue that CITGO cannot recover future damages
because the testimony of CITGO's damages expert, David Sweeten, was unreliable and should have
been excluded. (14) Appellants brought a pretrial motion to exclude Sweeten's testimony as unreliable
on grounds that there was no basis for an assumption that the "plume" of benzene and MTBE (15)
contamination from the gasoline that had escaped the ruptured CASA Pipeline had extended into the
surrounding area beyond Plum Creek, an area waterway. If Sweeten's testimony had been properly
excluded, appellants contend, there is no evidence of future damages.

 A trial court's decision to admit or exclude expert testimony is reviewed for an abuse
of discretion. Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex. 2001). "The test for abuse
of discretion is whether the trial court acted without reference to any guiding rules or principles." 
E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995). If a party opposes
and objects to the admission of expert testimony, the proponent bears the burden of demonstrating
its admissibility. Robinson, 923 S.W.2d at 557.

 Expert testimony is admissible if (1) the expert is qualified, and (2) the testimony is
relevant and based on a reliable foundation. Wilkins, 47 S.W.3d at 499; Robinson, 923 S.W.2d at
556. Scientific testimony is unreliable if it is not grounded "in the methods and procedures of
science," and amounts to no more than a "subjective belief or unsupported speculation." Robinson,
923 S.W.2d at 557 (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590 (1993)). 
Expert testimony is also unreliable if "there is simply too great an analytical gap between the data
and the opinion proffered." Gammill v. Jack Williams Chevrolet, 972 S.W.2d 713, 727 (Tex. 1998)
(quoting General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).

 Factors used by courts to determine whether expert testimony is reliable include: 


 1. the extent to which the theory has been or can be tested;


 2. the extent to which the technique relies upon the subjective
interpretation of the expert;

 

 3. whether the theory has been subjected to peer review and/or
publication;

 

 4. the technique's potential rate of error;

 

 5. whether the underlying theory or technique has been generally
accepted as valid by the relevant scientific community; and

 

 6. the non-judicial uses which have been made of the theory or
technique.



Robinson, 923 S.W.2d at 557. These factors are non-exclusive and flexible. Id.

 Sweeten testified concerning two estimates of future clean-up costs that he had
prepared. In his first estimate, which he had prepared in early 2004, Sweeten calculated total future
costs as $668,250.00. In his second estimate, which he prepared in November 2004, Sweeten revised
these calculations in light of intervening developments to yield a total of $1,270,000.00 in estimated
future clean-up costs. The focus of appellants' challenge is Sweeten's assumption in his second
cost estimate that contamination had extended from the rupture site beyond Plum Creek. Appellants
attack this assumption in light of Sweeten's admission that he had not completed a delineation of
the plume beyond the creek.

 The jury ultimately awarded $668,250.00 in future damages under both CITGO's
negligence and promissory estoppel theories, an amount corresponding precisely to Sweeten's first
cost estimate. Consequently, if Sweeten's testimony regarding his first cost estimate is relevant,
is reliable, and was properly admitted, that evidence alone could support the jury's future damages
award. We conclude that the district court did not abuse its discretion in admitting Sweeten's
testimony regarding his first cost estimate.

 Sweeten's first cost estimate was based on an area on the spill side of Plum Creek,
on which well testing had shown that MTBE and benzene were above acceptable TCEQ-approved
levels. The data retrieved from these temporary wells included points within a specific area between
the release site and Plum Creek and exhibited levels of both MTBE and benzene that exceeded
the TCEQ acceptable levels. These data points created a circular area of contamination from which
Sweeten calculated the estimated clean-up costs. Applying his experience to these data points,
Sweeten testified to future environmental clean-up costs totaling $668,250.00.

 According to the report prepared by Sweeten as well as his accompanying testimony,
some of the factors he considered in arriving at the $668,250.00 estimate were:



 Groundwater monitoring and reporting: collecting semi-annual
groundwater samples from the permanent monitoring wells, as
required by TCEQ for the life of the clean-up project


 


 Laboratory costs: costs incurred from submission of the gathered
samples to a lab for analysis


 


 Pilot testing, aquifer pump test, and remedial design: tests to
determine methods of running short-scale or short-duration tests to
determine the appropriate technology for interim corrective action, as
required by TCEQ


 


 Submission of APAR (Affected Property Assessment Report) or risk
assessment: compilation of all collected data


 


 Prepare response action plan (RAP): preparation of a report, as
required by the TCEQ
 Prepare site-specific discharge permit: costs incurred in obtaining a
permit to pump the water out so that contaminated water does not
reach Plum Creek


 


 Remedial system design, capital equipment and construction: based
on the data gathered, a report setting out the response action plan,
including capital costs for equipment to be used


 


 General project management regulatory interface: managing the tasks
and coordinating the people and equipment, including
communications with TCEQ




Sweeten testified that he then took the above line items and projected them out over the next
few years, to the extent that they were ongoing events. Sweeten also testified that he had prepared
similar cost estimates for CITGO on another pipeline project and on other projects for other clients
and that, based on this experience, he was generally familiar with how much these clean-up
procedures cost.

 Although there had not yet been a "complete delineation" such that CITGO did
not yet know the "full extent" of the problem, some testing and delineation activities had been
completed--notably, those in the area of the concentration circles on which Sweeten's first cost
estimate was based. Even assuming that appellants are correct in their assertion that there was no
evidence how far the contamination extended, there was at least evidence that the area contained in
the concentration circles--and the area on which Sweeten's first cost estimate was based--was
contaminated according to TCEQ standards. Contrary to appellants' assertion, Sweeten agreed that
he needed more information to determine a final remedial technology, not that he needed more
information to create a reliable cost estimate as to the designated area. With the data points available
to Sweeten, he was able to create a reliable initial cost estimate, which projected clean-up costs to
be $668,250.00. Although the full extent of the contamination may have been unknown at the time,
the figure of $668,250.00 was based on known, objective data points. We, therefore, conclude
that, based on Sweeten's experience and the known data points, his testimony with respect to the
initial cost estimate was reliable, and the district court acted within its discretion in admitting it. See
Gammill, 972 S.W.2d at 726 ("Experience alone may provide a sufficient basis for an expert's
testimony"). Accordingly, we overrule appellants' second issue.


Attorney's fees

 In their remaining nine issues, appellants challenge the district court's award of
$295,357.25 in trial-level attorney's fees and another $75,000 in conditional appellate attorney's
fees. This award was based on the jury's favorable findings regarding CITGO's promissory estoppel
theory of recovery, section 38.001(8) of the civil practice and remedies code, see Tex. Civ. Prac. &
Rem. Code Ann. § 38.001(8) (West 2008) (authorizing attorney's fees for claims for "an oral or
written contract"), and the evidence that the district court heard regarding the amount of such fees. 
Appellants assert essentially four types of challenges to the attorney's fee award.

 First, appellants bring a number of issues attacking CITGO's right to recover under a
promissory estoppel theory. Appellants argue that CITGO presented no evidence of any damages
compensable under a promissory estoppel theory, (16) that the evidence is legally and factually
insufficient to support the jury's finding that CITGO reasonably relied on any promise to its
detriment, (17) that CITGO's "promissory estoppel" claim "sounded in tort," (18) and that CITGO's
recovery in negligence eliminates any "injustice" that would justify the application of the promissory
estoppel doctrine. (19) See, e.g., Trammel Crow Co. No. 60 v. William Jefferson Harkinson and Jeff
Harkinson Investments, Inc., 944 S.W.2d 631, 636 (Tex. 1997) (promissory estoppel "may apply.
. . if injustice can be avoided only by enforcement of the promise"). Appellants also urge that the
jury's contributory negligence finding against CITGO bars its recovery under promissory estoppel,
as a matter of law, (20) and, relatedly, that the district court abused its discretion in refusing to submit
an "unclean hands" instruction to the jury. (21)

 In the alternative, in their eighth issue, appellants argue that a promissory estoppel
claim is not a claim for "an oral or written contract" that can support an award of attorney's fees
under section 38.001(8) of the civil practice and remedies code. (22) In the further alternative, in their
first issue, appellants urge that CITGO cannot "mix and match" recovery of actual damages based
on its negligence theory and attorney's fees under its promissory estoppel theory, but must be
required to elect to recover under only one of the theories. See JHC Ventures, L.P. v. Fast Trucking,
Inc., 94 S.W.3d 762, 774 (Tex. App.--San Antonio 2002, no pet). (23) Finally, in their fifteenth issue,
appellants complain that CITGO failed to segregate its attorney's fees among valid and invalid
grounds of recovery.

 We agree with appellants that CITGO cannot recover under a promissory estoppel
theory because CITGO presented no evidence of the types of damages that are compensable
under such a theory. As it has been recognized by the Texas Supreme Court, "[t]he function of the
doctrine of promissory estoppel is . . . defensive in that it estops a promisor from denying the
enforceability of the promise." See Wheeler v. White, 398 S.W.2d 93, 96 (Tex. 1965) (citing
Restatement (Second) of Contracts § 90 (1981)); see also In re Weekley Homes, L.P., 180 S.W.3d
127, 133 (Tex. 2005) ("we have long recognized . . . the defensive theory of promissory estoppel."). 
That is, promissory estoppel prevents a promisor who has induced substantial action or forebearance
by another from denying that promise if "injustice can be avoided only by enforcement," id. (citing
Harkinson, 944 S.W.2d at 636), but "it does not create a contract right that does not otherwise exist,"
Sun Oil Co. (Delaware) v. Madeley, 626 S.W.2d 726, 734 (Tex. 1981); see Hruska v. First State
Bank of Deanville, 747 S.W.2d 783, 785 (Tex. 1988). Rather, it merely "prevents a party from
insisting upon his strict legal rights"--i.e., the right to avoid his promise as not contractually
binding--"when it would be unjust to allow him to enforce them." In re Weekley Homes, L.P.,
180 S.W.3d at 133 (quoting Wheeler, 398 S.W.2d at 96).

 Although promissory estoppel may be the basis for an affirmative claim, Wheeler,
398 S.W.2d at 96, the supreme court has restricted the types of damages a promissory estoppel
plaintiff can recover to "enforce" a promise: "the promisee is to be allowed to recover no more
than reliance damages measured by the detriment sustained." Wheeler, 398 S.W.2d at 97. "Reliance
damages, similar to out-of-pocket recovery, reimburse one for expenditures made toward
the execution of the contract in order to restore the status quo before the contract." Hart v. Moore,
952 S.W.2d 90, 97 (Tex. App.--Amarillo 1997, pet. denied); see Restatement (Second) of Contracts
§ 349 (reliance damages "includ[e] expenditures made in preparation for performance or in
performance, less any loss that the party in breach can prove with reasonable certainty the injured
party would have suffered had the contract been performed"); see also Quigley v. Bennett,
227 S.W.3d 51, 56 (Brister, J., concurring and dissenting) ("reliance damages" for fraud
"compensate for the plaintiff's out-of-pocket expenditures"). In this way, reliance damages protect
a promisee's "reliance interest" in a contract or promise, or his interest in being reimbursed for loss
caused by reliance on the promise by being put in as good a position as he would have been had the
contract not been formed or promise relied upon. Restatement (Second) of Contracts §§ 344, 349;
see Quigley, 227 S.W.3d at 56 (Brister, J., concurring and dissenting); O'Farrill Avila v. Gonzalez,
974 S.W.2d 237, 247 (Tex. App.--San Antonio 1998, pet. denied). 

 Reliance damages are distinguished from expectancy or "benefit-of-the-bargain"
damages, which serve to protect the promisee's "expectation interest," or his interest in having
the benefit of his bargain by being put in as good a position as he would have been had the contract
or promise been performed. Restatement (Second) of Contracts § 344. Consequently, expectancy
damages like lost profits, for example, are not recoverable based on promissory estoppel. See
Sun Oil Co., 626 S.W.2d at 734 ("The damages recoverable by a party claiming estoppel are not
measured by the profits that such party's reliance led him to expect, but instead are limited to
the amount necessary to compensate that party for a loss already suffered."); Fretz Constr. Co.
v. Southern Nat'l Bank of Houston, 626 S.W.2d 478, 483 (Tex. 1981) ("Damages recoverable in a
case of promissory estoppel are not the profit that the promisee expected, but only the amount
necessary to restore him to the position he would have been in had he not acted in reliance on
the promise."). Similarly, consequential damages resulting from the failure to perform the promise
are likewise not recoverable. Id. The limitation of promissory estoppel damages solely to reliance
damages, rather than compensating for the loss of the full benefit of the breached or unperformed
contract or promise, reflects the view that "[s]ince the promisee in such cases is partly responsible
for his failure to bind the promisor to a legally sufficient contract, it is reasonable to conclude that
all that is required to achieve justice is to put the promisee in the position he would have been in had
he not acted in reliance upon the promise." Wheeler, 398 S.W.2d at 97. 

 As its promissory estoppel "reliance damages," CITGO obtained jury awards for its
damages resulting from the pipeline rupture. Question 10 asked the jury to determine the sum of
money that "would fairly and reasonably compensate CITGO for the damages incurred in the
past resulting from the detrimental reliance found in Question 9" (the promissory estoppel liability
issue), including "the reasonable cost in Caldwell County, Texas to restore the CASA Pipeline to
the condition it was in immediately before the occurrence" and "to respond to and remediate the
spill." With the exception of the "Tulsa overhead" instruction, previously discussed, Question 10
paralleled the question on past negligence damages, and the jury awarded damages that differed only
with respect to the "Tulsa overhead" amount. Similarly, Question 11 asked the jury to determine
the sum of money that "would fairly and reasonably compensate CITGO for the damages which
in reasonable probability will be incurred in the future resulting from the rupture of the CASA
Pipeline found in Question 9." The jury awarded identical future damages for both negligence and
promissory estoppel.

 CITGO did not present evidence of "reliance damages" apart from the damages it
attributes to the pipeline rupture. In CITGO's view, the pipeline rupture was "a direct result of its
reliance on Clint Ferguson's statement that Appellants' crews would not be working near CITGO's
pipeline that day" because it "acted in reliance on Clint Ferguson's promise and did not send out a
representative to demand and supervise the uncovering of the pipeline prior to excavation." In turn,
it contends that "[t]he environmental damages found by the jury were a direct result of the line
rupture from responding to the emergency, repairing the line, remediation of the soil, bioremediation
of the groundwater, testing and monitoring, to future monitoring and remediation to remove the
contamination." We cannot agree that the damages from the pipeline rupture are reliance damages
that CITGO can recover under its promissory estoppel theory.

 CITGO's promissory estoppel damages theory is that it should recover its costs of
repairing the pipeline and cleaning up the spill because (1) if Ferguson had kept his promise to give
CITGO prior notice before it excavated near the CASA Pipeline, (2) CITGO would have sent a
representative to the site, (3) who, in turn, would have located and uncovered the pipeline, and
(4) ensured that any excavation on the site would not have ruptured the pipeline. CITGO's damages
are not reimbursement for any amounts it expended in reliance on the promises, but compensation
for consequential losses CITGO claimed it incurred when appellants failed to perform their promises. 
Such damages are in the nature of expectancy damages: they place CITGO in the position it claims
it would have been had the promises been kept. Such damages are not recoverable through
promissory estoppel. See Sun Oil Co., 626 S.W.2d at 734; Fretz Constr. Co., 626 S.W.2d at 483. 

 Because there was no evidence that CITGO incurred reliance damages that can
support recovery under its promissory estoppel theory, we sustain appellants' thirteenth issue.
Consequently, the district court erred in awarding CITGO attorney's fees. We do not reach and
express no opinion regarding appellants' other challenges to the attorney's fees award.

 

CONCLUSION

 We reverse the portion of the district court's judgment awarding CITGO attorney's
fees on its promissory estoppel theory and render judgment that CITGO take nothing on that theory. 
As for CITGO's negligence claim, we hold that the evidence is legally insufficient to support
the jury's award of $1,159,194.75 in past damages, but there is sufficient evidence that CITGO
incurred $871,413.99 in such damages--a difference of $287,780.76. In light of CITGO's remittitur
of $287,780.76 in past negligence damages, we reform this portion of the district court's judgment
to award CITGO $871,413.99 in past negligence damages instead of $1,159,194.75. Similarly, as
we have overruled appellants' challenges to the portions of the district court's judgment apportioning
80 percent responsibility to MasTec for CITGO's negligence damages and 10 percent responsibility
to Bechtel, we reform the district court's judgment to award CITGO $697,131.19 in past negligence
damages from MasTec rather than $927,355.80, and $87,141.40 in past negligence damages from
Bechtel rather than $115,919.48. We likewise reform the district court's award of prejudgment
interest on these amounts to award CITGO $178,081.64 from MasTec and $22,260.21 from Bechtel.

As reformed, we affirm the district court's judgment.

_______________________________________

Bob Pemberton, Justice 

Before Justices Pemberton, Waldrop and Smith;

 (Justice B. A. Smith Not participating)


Reversed and Rendered in part; Reformed and, as Reformed,

Affirmed in part on Motion for Rehearing


Filed: December 19, 2008
1. The one-call act defines "excavate" or "excavation" to mean "to use explosives or a motor,
engine, hydraulic or pneumatically powered tool, or other mechanized equipment of any kind and
includes auguring, backfilling, boring, compressing, digging, ditching, drilling, dragging, dredging,
grading, mechanical probing, plowing-in, pulling-in, ripping, scraping, trenching, and tunneling to
remove or otherwise disturb soil to a depth of 16 or more inches." Act of Apr. 23, 1999, 76th Leg.,
R.S., ch. 62, § 18.17(a), 1999 Tex. Gen. Laws 392, 393 ("Former art. 9033"). 
2. A person may deliver this information "by any appropriate method, including the use of
electronic means of data transfer," and the notice is considered to have been provided when "the
person delivers the required information and a notification center receives that information within
the time limits prescribed by this Act." Id. § 11.
3. See id. § 2(2).
4. The one-call statute has since been amended to require an operator who does not
deem marking its facilities "necessary" to give notice of such action to the excavator within
48 hours. Act of May 22, 2001, 77th Leg., R.S., ch. 858, § 2, 2001 Tex. Gen. Laws 1707, 1707-08,
codified at Tex. Util. Code Ann. § 251.157(d) (West 2007). No such provision was contained in the
version of the one-call statute applicable to this case, however.
5. Schulle compared his use of the stakes to "the way you would use a highlighter on a piece
of paper" and "was in no way to tell anyone where the pipeline was specifically located."
6. Consequently, if, as Ferguson alleged, Schulle had estimated the pipeline route by lining
up the two vent pipes, Schulle would have identified the long side of a triangle whose other two sides
were formed by the pipeline's actual route.
7. The first difference was that the first sentence of section 9(a) omitted a qualifier found in
the statute, "Except as provided in sections 12 and 13 of this Act . . . ." Former art. 9033, § 9(a). 
The second was in section 14(a). The instruction omitted the statutory deadline for the operator to
mark their facility applicable when an excavator makes a Saturday notification and the intervening
Monday is a holiday--Wednesday at 11:59 a.m. Id. § 14(a). It is undisputed that the excavation at
issue here occurred on a Friday.
8. Appellants' proposed submission also contained a "further instruction" that "a joint
venture is a legal entity that meets the definition of a 'person' under the Texas One-Call Statute,"
with a definition of the essential elements of "joint venture." Because we conclude that the district
court did not abuse its discretion in submitting Question 12, we need not address whether, as CITGO
contends, the proposed "joint venture" instruction was not in substantially correct form.
9. This is illustrated by the amicus curiae brief filed by the National Utility Contractor's
Association, discussed infra.
10. In an amicus curiae brief, the National Utility Contractor's Association argues that "in
order to establish compliance with the statute, Citgo had to prove that it advised Appellants of its
intent to be present during the excavation that actually occurred and that Citgo confirmed the start
time of that excavation" and that "[o]nly if Citgo complied with these requirements and there was
a confirmed start time, would Appellants have had a duty to notify Citgo that they wanted to change
the start time and reach an agreement as to when to begin excavation." We generally agree that the
burden is initially upon the operator to comply with the requirements of section 9(c) before any
duties arise under it on the part of the excavator. As we have explained, the district court correctly
placed this burden in the jury charge. The Association further urges that "there is no evidence or
insufficient evidence that Citgo ever made a request to be present during the excavation that actually
took place near the Luling site or that Citgo complied with its obligation to 'confirm the start time
of the excavation.'" (Emphasis added). The Association's apparent premise is that an operator's
confirmation that no excavation will be occurring at a location on a particular day does not suffice
to "confirm the start time" of an excavation. Similarly, it suggests that if the excavator subsequently
reneges and excavates there anyway without informing the operator, the operator will have failed to
advise the excavator of its intent to be present "during the excavation that actually took place"
despite having been assured that the excavation would not be occurring at all. To the contrary, we
conclude from the text and structure of section 9(c) that an operator would necessarily "confirm the
start time" of an excavation if it confirmed that the excavator would start no excavation at a
particular location on a particular day, to the same extent as if the excavator provided a time at which
it actually would start excavating. In either case, if the excavator subsequently decided to deviate
from that understanding, section 9(c) would require it to "notify the operator to set a mutually
agreed-to time."
11. CITGO brings a cross-point in which it contends the evidence is legally and factually
sufficient to support the jury's findings in Question 12A that both MasTec/Wilde and C&S gave "the
notice required by Section 9(a) and 9(b) of the Texas One-Call Statute." Specifically, CITGO argues
that there is no evidence that anyone other than Clint Ferguson, a C&S employee, made one-call
notifications in connection with the Texas Loop Project work and that these calls by C&S did not
suffice when the "excavator" who damaged its pipeline was MasTec/Wilde. Because we have
overruled appellants' challenge to the jury findings that support the judgment regarding immunity,
we need not reach CITGO's cross-point.
12. For example, Bentley testified that he did not believe it necessary to readjust the stakes
after determining on May 6 that pipeline lay to the east of the middle stake because CITGO had been
assured that no excavation would take place at the location without prior notice.
13. This is the term CITGO uses in its spreadsheet to identify this category of expenses.
14. Appellants asserted this challenge against the jury's findings regarding both future
negligence and future promissory estoppel damages. As to each, the jury awarded the sum of
$668,250.00.
15. MTBE stands for methyl-tertiary-butyl-ether, a common additive to gasoline.
16. Appellants' thirteenth issue.
17. Issue twelve.
18. Issue nine. In fact, CITGO had sought submission of a negligent misrepresentation theory,
to which appellants objected on the ground that it had not been pled. The district court refused the
submission, and CITGO does not complain of that ruling on appeal. 
19. Issue eleven.
20. Issue ten.
21. Issue fourteen.
22. As appellants emphasize, Texas courts currently are split on that question. Compare
Doctors Hosp. 1997, L.P. v. Sambuca Houston, L.P., 154 S.W.3d 634, 635-38 (Tex. App.--Houston
[14th Dist.] 2004, pet. abated) (holding that attorney's fees are not recoverable under
section 38.001(8) for a promissory estoppel claim because such claims presuppose no "oral or
written contract") (quoting Subaru of Am., Inc. v. David McDavid Nissan, Inc., 84 S.W.3d 212, 226
(Tex. 2002) ("promissory estoppel doctrine presumes no contract exists")), with Preload Tech., Inc.
v. A.B. & J. Constr. Co., 696 F.2d 1080, 1094-95 (5th Cir. 1983) (Texas law) (upholding award
of attorney's fees for promissory estoppel claim enforcing a promise that the court compared to
an option contract). In unpublished opinions, this Court had upheld attorney's fee awards on
promissory estoppel claims. See Safe Env't v. Pelzel & Assocs., Inc., No. 03-09-00721-CV, 1999
Tex. App. LEXIS 7628 (Tex. App.--Austin 1999, no pet.) (mem. op.).
23. CITGO disputes this conclusion, but maintains that if it must elect between the two
theories, it would recover against MasTec/Wilde and C&S under promissory estoppel (including
attorney's fees) and against Bechtel in negligence.